The Reverend Timothy MOCKAITIS, and The Most Reverend Francis E. George, O.M.I., Plaintiffs–Appellants,

v.

F. Douglass HARCLEROAD, The Honorable Jack A. Billings, The Honorable Kip W. Leonard, Conan Wayne Hale, Jonathan Wayne Susbauer, and John Does Nos. 1–5, Defendants–Appellees.

No. 96–35901.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 1996.

Decided Jan. 27, 1997.

Thomas V. Dulcich, Bradley I. Nye, Schwabe, Williamson & Wyatt, Portland, Oregon, for plaintiffs-appellants.

Theodore R. Kulongoski, Virginia L. Linder, Eleanor E. Wallace, Timothy A. Sylwester, Salem, Oregon, for defendants-appellees Harcleroad, Judge Billings, Judge Leonard.

Mark E. Chopko, Jeffrey Hunter Moon, Washington, D.C., for amicus curiae United States Catholic Conference, National Council of Churches of Christ in the U.S.A., Christian Legal Society, The Church of Jesus Christ of Latter-day Saints, Clifton Kirkpatrick, as Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.), The American Jewish Congress, The Commission on Social Action of Reform Judaism, The Baptist Joint Committee on Public Affairs, and the Evangelical Lutheran Church in America, in the Support of the plaintiffs-appellants.

Frank W. Hunger, Michael Jay Singer, Lowell V. Sturgill, Jr., Matthew W. Collette, Washington, D.C., for intervenor United States of America.

Before NOONAN, THOMPSON and KLEINFELD, Circuit Judges.

## OPINION

NOONAN, Circuit Judge:

The Reverend Timothy Mockaitis (Mockaitis) and the Most Reverend Francis E. George, O.M.I. (George) appeal the dismissal by the district court of their suit against F. Douglass Harcleroad (Harcleroad); the Honorable Jack A. Billings (Billings); the Honorable Kip W. Leonard (Leonard); Conan Wayne Hale (Hale); Jonathan Wayne Susbauer (Susbauer); and John Does Nos. 1–5. We reverse the district court and remand for entry of an injunction.

### FACTS

We summarize the pertinent facts as presented by stipulation, affidavits, exhibits and uncontested testimony in the district court:

Mockaitis is a Catholic priest of the archdiocese of Portland, Oregon. On occasion he has administered the Sacrament of Penance to inmates of the Lane County Jail. George is the Catholic archbishop of Portland and is responsible for the proper celebration of Catholic sacraments within his archdiocese, which includes Lane County.

Harcleroad is the District Attorney for Lane County and is responsible for the prosecution of crimes within the county. Leonard and Billings are circuit judges of the county. In the spring of 1996 Hale and Susbauer were both inmates of the county jail. Hale was twenty years old at the time of the events in the case.

On April 23, 1996 Jeffrey James Carley, a detective in the county sheriff's office, filed an affidavit in support of a search warrant. The affidavit was prepared with the assistance of Trish Furlow and Joseph Kosydar of Harcleroad's office. According to the affidavit, Hale was a suspect in the murder on the night of December 20 or the early morning of December 21, 1995 of Kristal R. Bendele, Patrick M. Finley and Brandon M. Williams. In support of that belief, Carley stated that he had interviewed Hale a week after the crimes and that Hale had admitted to having been at the logging landing in a remote area near McGowan Creek with the three victims when they were killed and had admitted to striking Finley and Williams with a baseball bat, although he denied shooting them. Car-

ley's affidavit incorporated an affidavit made out by Dennis A. Williams of the Eugene Police Department on December 26, 1995. According to Williams, Susbauer had admitted to two detectives from the county sheriff's office that both he and Hale had participated in the three killings, each of them taking turns firing a single .38 calibre pistol. A witness confirmed seeing the three victims entering a truck where Hale was a passenger near the time of the murders.

The affidavits of Carley and Williams made evident a connection between the murders and two burglaries committed in the city of Eugene, Lane County, one on December 14, 1995 and the other on December 19, 1995. A description of the .38 calibre pistol stolen in the December 19 burglary matched the gun used in the murders. The body of Patrick Finley was clothed in a rabbit fur jacket stolen in this burglary. Sales of the property stolen had been traced to both Susbauer and Hale. Susbauer had admitted to the police that he and Hale had committed both burglaries. Hale had admitted to Detective Carley his involvement in both burglaries. Susbauer had already been indicted for the three murders.

The information in Carley's and William's affidavits, if true, provided a strong basis for believing that Hale was guilty of killing the three youthful victims, Bendele, Finley and Williams. Hale had been in the county jail since December 27, 1995. According to Carley, he had reviewed many of the tapes made of Hale's phone calls and conversations with visitors. Hale had "demonstrated his awareness that his visits are being recorded." On the basis of the information in the affidavits, Carley sought the search warrant for a new tape made on April 22, 1996 for the reason best described in his own words:

I learned from Sgt. Bud Spencer, supervisor at the Lane County Adult Corrections Facility, that on or before April 18, 1996 Conan Wayne Hale made arrangements to have a Catholic priest visit him on April 22, 1996 for the purpose of making a confession. On April 22, 1996 at 9:35 a.m. Conan Hale met with Father Mockaitis of St. Paul's Catholic Church in the visiting booths at the jail. That conversa-

tion was conducted via phone between the two rooms separated by glass. The conversation was recorded on an audio cassette tape per usual practice and was delivered to me by jail personnel who retrieved it from the recording machine. The tape is currently in the custody of the District Attorney's office where it is sealed and secured.

I know from my experience and training that the Catholic confession is an integral part of Catholicism. It is a sacrament. The basic tenet of confession is that a person is absolved of his or her wrongdoing upon making a full and complete acknowledgment of what that wrongdoing is. After the person gives that acknowledgment of what he or she has done wrong, the priest prescribes a penance. Upon performance of the penance, a person is absolved of his or her sins.

Based on the aforesaid information, your affiant has probable cause to believe, and does believe, that evidence of the crime of murder, to wit: a statement by Conan Wayne Hale can be seized from an audio tape located in the office of the Lane County District Attorney, 125 East 8th Avenue, Eugene, Oregon.

Unmentioned in the affidavit were the following facts disclosed in this case: The jail monitored about 90% of Hale's conversations, except conversations with his counsel. Hale "communicated with visitors in writing when he did not want jailers to monitor his conversations." In the sign-in area for visitors was an order of the sheriff that "no recording equipment" was allowed in the visiting area. Father Mockaitis did not know that his encounter with Hale was being recorded nor did he have reason to believe that it would be recorded. Hale was not a Catholic. He was a baptized Christian. In Catholic belief all baptized persons are eligible to participate in the Sacrament of Penance.

Bryant Hodges, district court judge for Lane County, issued the warrant requested by Carley, who executed it. The tape was transcribed into a typed document. Two deputy district attorneys, Kosydar and Patricia Perlow, listened to it.

*PROCEEDINGS*

The taping soon became known to the press and public. On May 7, 1996 representatives of the archdiocese met with Harcleroad to request the tape's destruction and a guarantee of no further taping of sacramental confession in the jail. On May 22, 1996 Harcleroad moved the county court to retain and seal the tape and to prohibit anyone who knew its contents from divulging them without further order of the court. Without a hearing or notice to anyone else, Judge Leonard granted the order.

On June 12, 1996 Father Mockaitis and Archbishop George filed a petition and motion in the county circuit court seeking the destruction of the tape and a continuation of the order as to the secrecy of the tape's contents. They asserted that the taping and its preservation violated both the federal and the state constitutions and federal and state statutes. They supported their claim with an affidavit as to the Sacrament of Penance in Catholic belief, filed by the Reverend Michael Maslowsky, a representative of Archbishop George, and by Father Mockaitis's own affidavit, in which he stated that as long as the tape remained in existence he stated, "I feel uncomfortable in administering the Sacrament of Penance (Reconciliation) in the Lane County Jail."

This petition was routed to another judge of the circuit, Judge Billings, to whom Hale's case had been assigned, Hale having been indicted on May 30 for aggravated murder. Judge Billings immediately wrote counsel for the petitioners as follows:

RE: *State v. Conan Wayne Hale*

Case No. 10–96–04830

Dear Mr. Dulcich:

This packet of papers which you submitted to the Court yesterday were routed to my chambers by the clerk's office, since it was not clear what should be done with them. To the extent that the Petition which you have submitted on behalf of the clergy attempts to intervene in the pending criminal case involving the above-named defendant that is not permitted by law. ORS 131.025.

To the extent that the documents you have presented to the Court represent an effort to commence some separate proceeding they do not state a justiciable controversy. They are, therefore, not suitable for filing. Accordingly, I'm returning your papers to you, together with your filing fee.

Finally, I enclose for your information a copy of an Order I have entered this date, upon the Motion of the above-named defendant, with the concurrence of the District Attorney, the parties to the criminal case. Please be advised that except upon further motion of one or both of the parties, or upon directive of some higher court, this Court will not consider, under any circumstances, the action which your clients desire.

Sincerely yours,

Jack A. Billings

Circuit Judge

The accompanying order, entered at the request of Hale, without notice to the priest and archbishop, read as follows:

THIS CAUSE coming before the Court on Defendant's motion to preserve evidence, in which the State concurs, and the Court being fully advised in the premises:

IT IS HEREBY ORDERED that all judicial officers and agents of the State who are now in possession or who may come into possession of a tape recording and transcript thereof of a conversation between Defendant and the Rev. Timothy Mockaitis which occurred on or about April 22, 1996 at the Lane County Jail are to preserve those items as evidence in the above-styled cause during the pendency of these proceedings.

On June 27, 1996 Father Mockaitis and Archbishop George filed this suit in the district court, setting out five claims based on the taping and retention of its contents: First, a claim under 42 U.S.C. § 1983, alleging violation of the right under the First Amendment to the free exercise of religion; second, also under § 1983, alleging violation of the Fourth Amendment; third, violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq;* fourth, violation of the Wiretapping Act, 18 U.S.C. § 2510 *et seq;* and fifth, violation of the Constitution of Oregon, Article I, Sections 2 and 3. They sought an order destroying the tape and transcript and prohibiting publica-

tion of its contents; an injunction prohibiting Harcleroad and all agents of the Lane County District Attorney's office from future interception and taping of the Sacrament of Penance "and similar religious communications at the Lane County Jail"; and a judgment declaring ORS § 165.540(2)(a) to violate the First Amendment and the Oregon Constitution if used to monitor confidential religious communications. They asked for their attorney fees and expenses under 42 U.S.C. § 1988(b). The state defendants answered, denying the plaintiffs' claims and asserting that "law enforcement officers in the ordinary course of their duties intercepted the conversation between plaintiff Mockaitis and defendant Hale." Hale answered, objecting to the requested destruction of the tape as impairing his defense to the capital charge of murder. Susbauer answered similarly.

In the course of this proceeding, the affidavit of the Reverend Bertram F. Griffin, J.C.D. was received as to the canon law and theology of the Catholic Church on the Sacrament of Penance. It was noted that "prior to the commencement of the action Lane County agreed not to intercept or tape conversations between Catholic clergy and inmates at the Lane County Jail." Harcleroad, Hale, and Susbauer all argued for the preservation of the tape. It was noted that counsel for Hale and Susbauer had already listened to the tape. On August 8, 1996 Hale filed an affidavit stating as follows:

> During my conversation with Father Mockaitis at the Lane County Jail on or about April 22, 1996, I made confession and asked for God to forgive me for the following transgressions: (1) for crimes of burglary which I committed with Jonathan Susbauer; (2) for being angry with and unable to forgive Susbauer for Susbauer having killed the three teenagers and for lying to the authorities about my involvement; and (3) for being angry with the District Attorney for believing Susbauer instead of me. I told Father Mockaitis that I did not commit any of the crimes people were accusing me of except the burglaries.

> The tape recording at issue would be much more accurate than my recollection of what was said during this conversation, because the conversation took place a long

time ago and I do not remember everything that I said or that Father Mockaitis said. By the time of my trial, my memory of this conversation will be even worse.

> I want the tape to be preserved and for my attorneys to be able to use it as evidence in my defense, because people may not believe what I say about it. Lots of people think that I confessed to killing the victims, because of the news reports about the tape, but I didn't confess to that because I didn't do it.

It was agreed that as Hale was charged with aggravated murder he would be subject, on conviction, to the death penalty, and that Harcleroad had given notice that he would seek the death penalty. Harcleroad stated that at the conclusion of the state proceedings against Hale and Susbauer the tape would be destroyed.

After receiving evidence and hearing argument the district court on August 15, 1996 dismissed the plaintiffs' claims. The court began by observing that the plaintiffs were "justifiably outraged" by Harcleroad's actions. The court added:

> Harcleroad himself admits that the taping was wrong: "There are somethings which are legal and ethical but are simply not right. I have concluded that tape recording confidential clergy-penitent communications falls within the zone of societally unacceptable conduct."

The court agreed with Harcleroad that the taping had been wrong.

Nonetheless the court, invoking *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), concluded that the duty of the federal court was to abstain from exercising jurisdiction where such exercise would interfere with the ongoing prosecution by the state of a criminal case. After coming to this conclusion against exercising any judicial power, the district court then undertook to "balance the equities" and held that Hale's and Susbauer's rights to a fair trial outweighed the First Amendment rights of Mockaitis and George. A judgment dismissing the action was entered against the plaintiffs.

Father Mockaitis and Archbishop George appeal.

## ANALYSIS

■ *Abstention.* In abstaining from determining the merits of the case, the district court did not literally apply *Younger*, for a key requirement of *Younger* is that the party seeking relief in federal court "has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43–44, 91 S.Ct. at 750. Mockaitis and George have no remedy at law and at least a portion of the injuries they have alleged will be irreparable without the equitable intervention of the federal courts. The county circuit court has held that they are not parties to the state's murder case against Hale. The county court has held that their petition and motion to destroy the tape did not state a cause of action under Oregon law. Alleging injuries under federal law, as they do, they are not compelled to speculate as to whether a higher Oregon court would grant them relief. They are free to seek federal remedies in the federal courts.

In addition, much of the relief they seek would not interfere with the ongoing state prosecution. We do not decide whether, had the complaint sought only destruction of evidence in a pending criminal trial, *Younger* abstention would have been necessary. That is not all the complaint sought. The complaint also sought an injunction against future interception and recording of sacramental confessions in the jail and a declaratory judgment that any such interception and taping was unconstitutional. An injunction and declaratory judgment limited to such relief would not interfere at all with the pending criminal prosecution of Hale and Susbauer, so *Younger* did not require abstention from the entire case. We need not decide whether the district court erred in abstaining under *Younger* from deciding whether to order destruction of the tape and nondisclosure of the contents, because we deny that relief as well, though on different grounds.

Focusing on the requested destruction of the tape, the district court in effect overlooked what the plaintiffs asked. The virtually unflagging obligation of a federal court to exercise jurisdiction when it has it makes it error to abstain from deciding this case where serious violations of the laws and Constitution of the United States are alleged and substantial relief can be afforded without disruption of a state criminal trial.

*The Violation Of The Religious Freedom Restoration Act.* Mindful of our obligation to decide a case on statutory grounds if possible, we begin with the plaintiffs' claims under RFRA.

In RFRA Congress finds: "[L]aws, 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." RFRA, 42 U.S.C. § 2000bb(a). Congress prescribes:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

*Id.* § 2000bb–1(a) and (b).

A person whose religious exercise is burdened in violation of this section "may assert that violation as a claim or defense ... and obtain appropriate relief against a government." *Id.* (c). "Government" includes an agency or official of the United States or any state or subdivision of a state. "Demonstrates" means to meet "the burdens of going forward with the evidence and of persuasion." "Exercise of religion" means "the exercise of religion under the First Amendment to the Constitution." *Id.* § 2000bb–2(1), (3) and (4). Nothing in this chapter "shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion." *Id.* § 2000bb–4.

Before we can consider the impact of the statute we are confronted by Harcleroad's contention that the statute is unconstitutional. The problem is, as he explains, that the statute goes beyond what is required of a state by the First Amendment, as incorporated in the Fourteenth Amendment and as interpreted by *Employment Div., Oregon Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Under *Smith* the guarantee of the free exercise of religion does not relieve an individual "of the obligation to comply with a valid and neutral law of general applicability" on the ground that the law prescribes or proscribes conduct interfering with the individual's exercise of religion. *Id.* at 879, 110 S.Ct. at 1600. The valid and neutral law of general applicability on which the prosecutor relies is ORS 165.540(2)(a), which the prosecutor argues implicitly authorizes those in charge of a jail to intercept and record conversations between inmates and all visitors save their counsel. The prosecutor adds that he has an affirmative obligation under Oregon law to disclose to a criminal defendant all of his recorded statements, ORS 135.815, and to prevent the destruction of physical evidence, ORS 162.295. These statutes, too, are asserted to be valid, neutral, and generally applicable. If RFRA invalidates the application of these laws here, Harcleroad argues, then the state is being subjected to the First Amendment beyond what *Smith* permits and RFRA must be held unconstitutional. The prosecutor completes his argument with the invocation of *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) where the Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021b *et seq.* was held to violate the Tenth Amendment by commanding the states to implement legislation enacted by Congress.

Harcleroad has an additional challenge to the constitutionality of RFRA, a challenge deadly in its implications for religious liberty. It is that RPRA, because it advances the exercise of religion, is an establishment of religion and therefore offensive to that portion of the First Amendment which reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Harcleroad cites the three-pronged test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which he claims the advancement of religion accomplished by RFRA fails. He adds for good measure that enforcement of the federal statute necessitates an "excessive entanglement" of the government with religion and so runs up against "the Establishment Clause jurisprudence" of *Lemon.*

The United States has exercised its right to intervene as a party where the constitutionality of a federal statute is attacked, and it has vigorously defended the validity of the law, enacted by Congress without a dissenting vote in the House, 139 Cong.Rec. H8713 (November 3, 1993), only three dissents in the Senate, 139 Cong.Rec. S14471 (October 27, 1993) and signed by President Clinton on November 16, 1993.

We reject Harcleroad's challenge to RFRA for three reasons. The first two reasons explain why Harcleroad's facial attack on the constitutionality of the statute fails. The third reason responds to his challenge to the statute as applied.

*First.* There is no doubt that Congress under Section 5 of the Fourteenth Amendment has the power to enforce the provisions of the Bill of Rights that the Fourteenth Amendment incorporates and makes binding on the states. Section 5 is "a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828 (1966). The legislative power is not confined to ratifying restrictions placed on the states by the judiciary construing the Bill of Rights; such a narrow reading of the power granted "would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment." *Id.* at 648, 86 S.Ct. at 1722. The legislative power granted is as broad as the power of Congress under the Necessary and Proper Clause of Article I, § 8, cl. 18. *Id.* at 650, 86 S.Ct. at 1723.

*Second.* Harcleroad's Establishment theory is that whenever Congress exempts religion from generally applicable law it unconstitutionally advances and therefore unconstitutionally establishes a religion; at the same time in order to effect the exemption Congress must get excessively involved in determining what is a religion. The exemptions and deductions of the Internal Revenue Code, §§ 501(c) and 170(c)(2)(B) must be bad. The deferments of the Selective Service Act, 50 Ap. U.S.C. § 456(g) must be invalid. The creation of chaplaincies in Congress and in the armed forces—particularly striking promotions of religion—must be suspect. The narrow logic of this attack is refuted by the experience of the nation. Of course the statutory protection of the free exercise of religion is good for religion. Neither the benefit nor the means are contrary to the first liberty assured by the First Amendment and made concrete by RFRA. Of course, application of RFRA, like the application of the First Amendment itself and any objection made under this amendment, requires a court to determine what is a religion and to define an exercise of it. There is no excessive entanglement. We join the other courts of appeal that have considered this challenge and rejected it. *Sasnett v. Sullivan,* 91 F.3d 1018 (7th Cir.1996); *EEOC v. Catholic University,* 83 F.3d 455 (D.C.Cir.1996); *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir. 1996), *cert. granted* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 212.

■ *Third.* The acts of the prosecutor here that are at the core of the plaintiffs' complaint did not amount to the neutral application of any Oregon statute but were an attempt to use the statutory authorization to monitor inmate conversations in order to gain access to a confession expected to be given in accordance with a religious rite. As Carley put it, he expected the confession to contain "a full and complete acknowledgment" by Hale as a condition of his receiving absolution; Carley believed that the confession would contain "evidence of the crime of murder." The search warrant sought to use the sacramental confession as a tool to establish Hale's guilt. Deliberately, the religious rite was focussed upon and preserved for exploitation as state's evidence.

■ No question exists that Harcleroad is an official of a subdivision of the State of Oregon. No question exists that he has substantially burdened Father Mockaitis's exercise of religion as understood in the First Amendment. Father Mockaitis was exercising his religion in a priestly function. He was seeking to participate in the Sacrament of Penance understood by the Catholic Church to be a means by which God forgives the sins of a repentant sinner and restores the sinner to life in God's grace. It is a sacrament that from experience the Catholic Church has surrounded with extraordinary safeguards so that the content of the penitent's confession will not be revealed unless the penitent himself chooses to reveal it; and these safeguards have the evident reason that the knowledge, belief, or suspicion that freely-confessed sins would become public would operate as a serious deterrent to participation in the sacrament and an odious detriment accompanying participation. When the prosecutor asserts the right to tape the sacrament he not only intrudes upon the confession taped but threatens the security of any participation in the sacrament by penitents in the jail; he invades their free exercise of religion and doing so makes it impossible for Father Mockaitis to minister the sacrament to those who seek it in the jail.

■ Harcleroad is provided with a statutory defense if he can prove that his actions were "in furtherance of a compelling governmental interest" and that he used "the least restrictive means" of furthering that interest. RFRA, 42 U.S.C. § 2000bb–1(b) Taping a sacramental confession was an easy way to secure additional evidence if the detective's hunch about what would be confessed was right. But the ordinary means of proving a case by good police work were "the least restrictive means" of furthering the prosecutor's desirable goal. Understandably, Harcleroad does not even attempt to dispute this point and offers no defense when RFRA is applied to the taping itself.

■ A question does exist as to the preservation of the tape until the termination of the proceedings against Hale and Susbauer; or rather, there may be two questions: Does preservation substantially burden Mockaitis's exercise of religion? Does Harcleroad have a defense under RFRA? As to the first, Mockaitis has stated that the continued existence of the tape gives him discomfort and that every new public reference to it is hurtful to him. His reaction is understandable. Out of nowhere, as it must have seemed to him, the performance of a rite that he believed was enshrined in secrecy became a matter for the media, for the courts, for the public at large. His sense of betrayal is reinforced by each reference to the confession's existence on the tape. But it is hard to see that these unpleasant reminders substantially burden his free exercise of religion any more than memory of the first intrusion must rankle. Hale has chosen, as was his undisputed right as a penitent, to disclose in the district court the contents of his confession. Mockaitis does not and cannot seek to destroy this disclosure. Mockaitis knew that such voluntary disclosure by Hale was possible. Hale asks that the recorded counterpart of his disclosure be kept in existence for his criminal trial. The psychological burden thereby put on Mockaitis is not a burden on his religion or its exercise. It is, therefore, unnecessary to consider the defense under the statute that Harcleroad offers.

■ The reasoning as to the burden imposed on Father Mockaitis applies analogously to the burden imposed on Archbishop George. No substantial burden is imposed on him by the preservation of a confession whose contents the penitent himself has chosen to make public. A substantial burden is imposed on his free exercise of religion as the responsible head of the archdiocese of Portland by the intrusion into the Sacrament of Penance by officials of the state, an intrusion defended in this case by an assistant attorney-general of the state as not contrary to any law. Archbishop George has justifiable grounds for fearing that without a declaratory judgment and an injunction in this case the administration of the Sacrament of Penance for which he is responsible in his archdiocese will be made odious in jails by the intrusion of law enforcement officers.

■ We take note of the stipulation that Lane County Jail has "agreed not to intercept or tape conversations between Catholic clergy and inmates at the Lane County Jail." The stipulation is far from satisfactory. It does not state to whom Lane County Jail made this promise, or who at the jail made it, or how long the promise is good; and it appears to accord a blanket immunity to conversations with Catholic clergy not extended to clergy of other faiths. The stipulation does not remedy the violations of RFRA, or moot out the case.

■ *The Alleged Violation Of The Wiretap Act.* 18 U.S.C. § 2511 makes it a federal felony wilfully to intercept any wire communication or to disclose or use such wilful interception, but the statute does not apply to interceptions "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a). According to the stipulated facts, Lane County jailers taped about 90% of Hale's conversations. The plaintiffs have made no showing that the taping of Father Mockaitis was not done in the ordinary course of the jailors' duties, nor have the plaintiffs challenged the status of the jailors as law enforcement officers within the meaning of § 2510(5)(a). The taping of the confession was a violation of RFRA and so should not have been part of the ordinary course of duty of any law enforcement officer; but that the taping was done in ordinary course negates the wilfulness required by the statute. *See Cheek v. United States,* 498 U.S. 192, 201–02, 111 S.Ct. 604, 610–11, 112 L.Ed.2d 617 (1991). The interception was therefore not a violation of the Wiretap Act and Harcleroad's subsequent retention of it was therefore not a felony.

■ *The Violation of the Fourth Amendment.* Mockaitis had two bases for a reasonable expectation of privacy in his encounter with Hale: First, ORS Evidence Code § 40.260, Rule 506, "Member of clergy-penitent privilege," provides that "[a] member of the clergy shall not, without the consent of the person making the communication, be examined as to any confidential communica-

tion made to the member of the clergy in the member's professional character." As Mockaitis could not be examined directly in court on a confession it was reasonable for him to suppose that the prohibition of Rule 506 could not be easily circumvented by the prosecutor taping a confession made to him.

Secondly, the history of the nation has shown a uniform respect for the character of sacramental confession as inviolable by government agents interested in securing evidence of crime from the lips of criminal. The first known case in the United States to consider such an attempt is famous for the court's rejection of the invasion and for the court's reason for its rejection. DeWitt Clinton, later Governor of New York and at the time Mayor of New York City, a noted statesman and astute analyst of the spirit of the new republic, speaking for the Court of General Sessions, declared:

A provision conceived in a spirit of the most profound wisdom, and the most exalted charity, ought to receive the most liberal construction. Although by the constitution of the United States, the powers of congress do not extend beyond certain enumerated objects; yet to prevent the danger of constructive assumptions, the following amendment was adopted: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In this country there is no alliance between church and state; no established religion; no tolerated religion—for toleration results from establishment—but religious freedom guaranteed by the constitution, and consecrated by the social compact.

It is essential to the free exercise of a religion, that its ordinances should be administered—that its ceremonies as well as its essentials should be protected. The sacraments of a religion are its most important elements. We have but two in the Protestant Church—Baptism and the Lord's Supper—and they are considered the seals of the covenant of grace. Suppose that a decision of this court, or a law of the state should prevent the administration of one or both of these sacraments, would not the constitution be violated, and

the freedom of religion be infringed? Every man who hears me will answer in the affirmative. Will not the same result follow, if we deprive the Roman catholic of one of his ordinances? Secrecy is of the essence of penance. The sinner will not confess, nor will the priest receive his confession, if the veil of secrecy is removed: To decide that the minister shall promulgate what he receives in confession, is to declare that there shall be no penance; and this important branch of the Roman catholic religion would be thus annihilated.

*People v. Phillips,* N.Y.Ct.Gen.Sess. (1813), as reported by a lawyer who participated in the case as amicus curiae and as reprinted in *Privileged Communications To Clergymen,* 1 Cath.Lawyer 199, 207 (1955).

The evidentiary privilege as it has existed in the United States has been broadly recognized and affirmed in dicta by the Supreme Court. So Justice Field remarked for a unanimous court that "suits cannot be maintained which would require a disclosure of the confidences of the confessional, or those between husband and wife." *Totten v. United States,* 92 U.S. 105, 107, 23 L.Ed. 605 (1875). So Chief Justice Burger, a century later, observed approvingly, again for a unanimous court, that the priest-penitent privilege, like the privileges between attorney and client and between physician and patient, was "rooted in the imperative need for confidence and trust." *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). The privilege has been stated broadly as embracing any "confession by a penitent to a minister in his capacity as such to obtain such spiritual aid as was sought and held out in this instance" and so applied to reverse a criminal conviction where a Lutheran communicant had confessed her crime to a minister as a condition for receiving communion and his testimony had been used to convict her. *Mullen v. United States,* 263 F.2d 275, 277 (D.C.Cir.1958).

All fifty states have enacted statutes "granting some form of testimonial privilege to clergy-communicant communications. Neither scholars nor courts question the legitimacy of the privilege, and attorneys rarely litigate the issue." *Developments In The*

*Law—Privileged Communications,* 98 Harv. L.Rev. 1450, 1556 (1985); W.Va.Code § 57–3–9. It would be strange if a privilege so generally recognized could be readily subverted by the governmental recording of the privileged communication and the introduction of the recording into evidence.

Against these reasons for objectively concluding that Father Mockaitis's subjective belief in the secrecy of the confession was well-founded, there was the fact that Oregon had legislated against the interception of conversation between a prisoner and his attorney but had not done so against the interception of a confidential communication from an inmate to a member of the clergy; there was also the fact that Wiretap Act did not criminalize recordings made by law enforcement officers in the ordinary course of their duties. We do not believe that the expectation of Father Mockaitis can be made to depend on what a statute fails to forbid. If the inviolability of religious confession to the clergy were not the law of the land, the expectation of every repentant sinner, and the assured confidence of every minister of God's grace, a prosecutor would have a cheap and sometimes helpful way of uncovering evidence of crime by obtaining a court order under § 2516 of the Wiretap Act to wire a church known to be frequented, say, by families or other persons believed to be associated with a criminal organization. On Harcleroad's reasoning such bugging would be lawful because authorized by a judge in accordance with statute and not unlawful because contrary to the reasonable expectations of the participants. Such a fear does not exist because no one expects any prosecutor to engage in such a strategy.

Harcleroad has cited no case in the United States in which a court has given approval to the invasion of the Catholic rite of confession by an agency of government. Our own research has discovered none. A comprehensive study of the issue done as a thesis at Boalt Hall reports none in this country. Jacob M. Yellin, *The History And Current Status Of The Clergy–Penitent Privilege,* 23 Santa Clara L.Rev. 95 (1983). Hard as a negative is to prove, it must be concluded that no evidence has been offered that would

have led a priest in Father Mockaitis's shoes to expect that his participation in the Sacrament of Penance would be bugged. He was reasonable in relying on the Oregon law of evidence and the nation's history of respect for religion in general and respect for the sanctity of the secrets of confession in particular, and so had a reasonable expectation of privacy.

Harcleroad argues that Hale did not have such an expectation. Stipulated facts include the fact that Hale did know that his meetings with visitors were recorded and made signals to his visitors to warn them not to speak of matters that Hale did not want disclosed. The contents of Hale's confession, as revealed in his affidavit, are highly suggestive that he knew he was being recorded. He admitted to burglaries that he had already confessed to the police. The centerpiece of his confession was an accusation against Susbauer as the murderer and a protestation of his own innocence. The accusation and the protestation were given the form of a confession by being dressed up in Hale's asserted sorrow for his anger; but it may be doubted that he had any reason to repent anger if in fact his anger had been a response to a false accusation of murder. From the contents of the confession itself it is reasonable to infer that Hale hoped that his words would be recorded and preserved; and his subsequent actions confirm the inference.

It is neither logically nor factually impossible for one party to a communication to have an expectation of privacy and the other not to have one. Hale's expectation does not destroy Mockaitis's. But it does affect the remedy. There is no reason to protect Hale's confession from publication when he desires it. There is reason to protect Father Mockaitis's expectation of privacy in hearing confessions. Archbishop George's expectation is, analogously, equally reasonable.

*The Violation Of The Civil Rights Act.* The plaintiffs also seek relief under the more general Civil Rights Act, 42 U.S.C. § 1983, which provides redress for the deprivation of any right "secured by the Constitution and laws." As our analysis under RFRA and the Fourth Amendment indicates, Harcleroad has violated the civil rights of the plaintiffs

secured by RFRA and by the Fourth Amendment. Proving their case under these heads, the plaintiffs have also proved their case under the Civil Rights Act, with the exception already noted as to their case for destruction of the tape.

*The Oregon Constitutional Claims.* The plaintiffs' rights are so secured by federal statutes and the Fourth Amendment that it is unnecessary for us to pass on these claims which were not addressed by the district court.

*The Remedies.* We remand for a grant of the plaintiffs' request for declaratory relief, holding that the taping of Father Mockaitis's encounter with Hale and its subsequent seizure by Harcleroad violated RFRA and the Fourth Amendment. We remand to the district court for the issuance of an injunction in favor of Father Mockaitis and Archbishop George. The injunction may be tailored to fit the expectation of clergy under ORS Evidence Code, Rule 506 and so should restrain Harcleroad and his agents and employees from further violation of RFRA and the Fourth Amendment by assisting, participating in or using any recording of a confidential communications from inmates of the Lane County Jail to any member of the clergy in the member's professional character. We also remand to the district court to take evidence as to the attorney fees to which the plaintiffs are entitled under the Civil Rights Act for both the litigation in the district court and on this appeal. They have prevailed, not as to all the relief sought but nevertheless substantially, on the one claim on which attorney fees may be awarded.

The judgment of the district court is **REVERSED** and the case is **REMANDED** for proceedings in accordance with this opinion.