## THE SOCIETY OF JESUS OF NEW ENGLAND
### *vs.* COMMONWEALTH.
### JAMES F. TALBOT *vs.* COMMONWEALTH.

Suffolk. December 1, 2003. - May 13, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Church. Religion. Jurisdiction,* Ecclesiastical controversy. *Constitutional Law,* Freedom of religion, Freedom of association. *Privileged Communication. Subpoena.*

This court concluded that the doctrine of "church autonomy" protected under the free exercise clause of the First Amendment to the United States Constitution and art. 46, § 1, of the Amendments to the Massachusetts Constitution did not prohibit the enforcement, as part of a criminal prosecution for alleged sexual assaults against a priest who was a member of a religious order, of a subpoena duces tecum requiring the religious order to produce various documents pertaining to the accused priest, where enforcement of the subpoena did not require resolution of any dispute between the accused priest and the religious order. [667-669]

In the context of civil actions brought by a religious order and one of its members, a priest charged with sexual assaults, challenging an order issued in a criminal action denying their motions to quash a subpoena duces tecum requiring the religious order to produce various documents pertaining to the accused priest, on the ground that enforcement of the subpoena burdened the free exercise of their religion in violation of art. 46, § 1, of the Amendments to the Massachusetts Constitution, this court concluded that, although the religious order and the accused priest met their burden of demonstrating that confidentiality in their communications and in the religious order's internal review of priests was based on religious belief, and that a subpoena requiring them to divulge those materials would conflict with that belief, their interest in maintaining confidential communications was outweighed by the Commonwealth's compelling interest in obtaining the documents, the equivalent of which could not elsewhere be obtained. [669-673] SPINA, J., dissenting, with whom COWIN and CORDY, JJ., joined. CORDY, J., dissenting, with whom SPINA and COWIN, JJ., joined.

This court concluded that the enforcement of a subpoena duces tecum requiring a religious order to produce various documents pertaining to a member priest criminally accused of committing sexual assaults would not violate the establishment clause of the First Amendment to the United States Constitution, where inhibition of religious belief was not a principal or primary effect of the subpoena, and where the enforcement of the subpoena would not result in any excessive government entanglement with religion [674-675]; moreover, nothing in the enforcement of the subpoena would burden the accused priest's right to freedom of association [675-676].

The Society of Jesus of New England *v.* Commonwealth.

Enforcement of a subpoena duces tecum for the production of certain documents would not violate the right of a religious order or a criminally accused member of that order to freedom of worship under art. 2 of the Massachusetts Declaration of Rights, where the production of documents would not burden or restrain them in their performance of any religious rituals or ceremonies of worship. [676-678]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on August 1, 2003.

The cases were reported by *Cordy*, J.

*Paul B. Galvani* (*Nikolas P. Kerest* with him) for The Society of Jesus of New England.

*Timothy P. O'Neill* (*Sharon H. Patton* with him) for James F. Talbot.

*Audrey C. Mark*, Assistant District Attorney (*John P. Zanini*, Assistant District Attorney, with her) for the Commonwealth.

SOSMAN, J. The Society of Jesus of New England (Jesuits) and James F. Talbot seek relief under G. L. c. 211, § 3, from an order denying their respective motions to quash a subpoena duces tecum. The subpoena, issued by the Commonwealth in connection with its pending prosecution of Talbot, requires the Jesuits to produce various documents pertaining to Talbot. Talbot and the Jesuits claim various privileges with respect to certain of the documents, including the claim that forced disclosure of the documents would violate the free exercise clause of the First Amendment to the United States Constitution, art. 2 of the Massachusetts Declaration of Rights, and art. 46, § 1, of the Amendments to the Massachusetts Constitution. A single justice of this court has reserved and reported the following question: "Does either the First Amendment or the Massachusetts Declaration of Rights protect documents 1, 7, 10-15, 21-24, 28, 31, and 37, all in the possession, custody, and control of the Society of Jesus, from production pursuant to the Commonwealth's subpoena?"[1] For the following reasons, we answer the reported question in the negative.

1. *Procedural background.* Talbot, a Jesuit priest, has been

---

[1]While the reported question refers generally to protection under "the Massachusetts Declaration of Rights," we interpret the question to encompass both provisions of the Massachusetts Constitution relied on by the parties.

charged with sexually assaulting two former students at Boston College High School, where Talbot taught in the 1970's. When the grand jury issued a subpoena duces tecum to the Jesuits' keeper of records seeking materials from Talbot's personnel file, the Jesuits produced some documents responsive to that subpoena, but withheld thirty-seven documents claiming that each of them was protected by one or more of the following privileges: the First Amendment (or "equivalent provisions of the Massachusetts Constitution and Declaration of Rights"), the priest-penitent privilege (G. L. c. 233, § 20A), the psychotherapist-patient privilege (G. L. c. 233, § 20B), or the attorney-client privilege. After indictments were returned, the Commonwealth moved to reissue an identical subpoena, seeking to challenge the claims of privilege. Another subpoena issued, and the Jesuits and Talbot moved to quash, raising identical claims of privilege with respect to the same thirty-seven documents. After hearing, and after review of the documents in camera, the judge allowed the motion with respect to eight of the disputed documents and a portion of an additional document, but denied the motion with respect to the remaining twenty-eight documents. The Jesuits were ordered to produce those documents, including one document in redacted form, as to which the motion to quash had been denied. The judge stayed her order pending the outcome of the present G. L. c. 211, § 3, petitions.

In their respective petitions, Talbot and the Jesuits sought relief from the judge's order, but only as to fifteen of the documents that had been ordered produced. After argument, the single justice reported the sole question before this court and retained jurisdiction over all other issues (including the applicability of asserted privileges, issues of waiver, and the Commonwealth's argument that G. L. c. 211, § 3, relief was inappropriate because the petitioners had or would have other avenues of review available to them).

2. *Factual background.* Talbot joined the Jesuits in 1955 and was ordained a priest in 1968. He was a teacher and athletic coach at Boston College High School from 1972 until 1980, at which point he went to teach at Cheverus High School in Portland, Maine. In 1998, a former student at Cheverus High

School alleged that he had been sexually abused by Talbot. At that time, Reverend John P. Murray, the executive assistant for the Jesuits, was responsible for responding to such allegations made against any members of the Jesuits. He traveled to Maine to meet with Talbot and advise him of the accusations that had been made against him. He wrote a "Confidential Memo" concerning that meeting (document 28), sending that memorandum only to "File." He also kept handwritten notes (document 37) of various contacts he had (including notes and a report concerning a meeting with the alleged victim's family) at the time these allegations surfaced.[2]

Talbot was placed on administrative leave and was sent to St. Luke Institute (institute), a psychiatric hospital in Maryland, for evaluation and treatment. The medical staff at the institute has training and experience in the evaluation and treatment of priests, including priests who have problems related to sexual abuse and alcoholism. The purpose behind sending a priest to the institute is to provide him with appropriate treatment and to allow the Jesuits "to make responsible decisions with respect to any future treatment and ministry of that Jesuit." During his stay at the institute, Talbot wrote letters to Father Murray and to Father Robert Levens, the New England Provincial of the Jesuits. Eight of those letters (documents 1, 7, and 10-15) are now being withheld on grounds of privilege.[3]

On July 22, 1998, shortly after Talbot began his stay at the institute, civil litigation against the Jesuits and Talbot was commenced in Maine stemming from the alleged incidents of abuse at Cheverus High School. On several occasions, personnel at the institute wrote to Talbot's counsel in Maine, and provided counsel with therapy notes and a discharge summary pertaining to the institute's evaluation and treatment of Talbot (documents 21-24 and 31). Those records and correspondence

---

[2]Although the judge ordered that document 37 be produced, she did allow the motion to quash with respect to those portions of document 37 that reflected Reverend Murray's communications with counsel for the Society of Jesus of New England (Jesuits).

[3]In their original motion to quash, sixteen such letters were alleged to be privileged, but no claim of error with respect to the order to produce those other eight letters has been raised before the single justice.

were later shared with the Jesuits pursuant to a "Joint Defense Agreement."[4]

3. *Discussion.* While multiple privileges have been asserted with respect to these various documents, the sole question before us is whether the free exercise clause of the First Amendment, art. 2, or art. 46, § 1, protects the confidentiality of these documents. In various ways, Talbot and the Jesuits try to bolster their claims of constitutional protection by alluding to other allegedly applicable statutory privileges (i.e., Talbot's privilege to keep his communications with psychotherapists confidential, G. L. c. 233, § 20B, and his privilege to prevent the disclosure of any "confession" or "communication" made to a priest "in seeking religious or spiritual advice or comfort," G. L. c. 233, § 20A). However, neither the applicability of those other privileges nor any issue pertaining to waiver of privileges is presently before us.[5] The sole question is whether any of the cited constitutional provisions, by itself, protects these documents from the Commonwealth's subpoena. Protections that might be provided by those other sources of privilege do not add weight to the constitutional analysis we perform, but will instead be decided on their own merits by the single justice.

[4]At the time of his admission to St. Luke Institute (institute), Talbot had signed a release allowing the institute to send reports directly to the Jesuits. However, by the fall of 1998, after litigation had commenced, reports were being provided to Talbot's counsel in Maine, and only provided to the Jesuits through counsel.

[5]Talbot repeatedly alludes to the fact that his status as a Jesuit priest imposed on him a duty of obedience to his superiors, apparently suggesting that, because he was compelled to respond to his superiors' questions, his statements were not voluntary. See *Commonwealth* v. *Benoit*, 410 Mass. 506, 511 (1991), and cases cited (admission or confession, "whether made to police or to a civilian, is admissible only if it is voluntarily made"). However, the judge below was ruling on a motion to quash a subpoena, not a motion in limine, and any issue pertaining to voluntariness (or any other theory potentially affecting the admissibility of Talbot's statements) was not before either the motion judge or the single justice. That issue is not part of the question before us, and we express no opinion as to whether Talbot's statements to his superiors should be excluded from evidence at trial on grounds of involuntariness. See *Commonwealth* v. *Drake*, 15 Mass. 161, 162 (1818) (where defendant made "penitential confessions" before members of his church, but confession was not "required by any known ecclesiastical rule," use of those confessions at trial did not violate defendant's right against self-incrimination).

With that caveat, we turn to the claims of constitutional protection.

a. *Protection of "church autonomy."* Both Talbot and the Jesuits invoke what they refer to as the doctrine of "church autonomy," protected under the free exercise clause of both the First Amendment and art. 46, § 1. See *Hiles* v. *Episcopal Diocese of Mass.*, 437 Mass. 505, 510-511 (2002), and cases cited; *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 579-580 (2002). Under that doctrine, the courts lack subject matter jurisdiction "over church disputes touching on matters of doctrine, canon law, polity, discipline, and ministerial relationships." *Id.* at 579. However, in each of the cases illustrating the application of this doctrine, the court was being asked to resolve a dispute within the church itself, or to impose liability for the manner in which the church had handled or resolved that intra-church dispute. See *Hiles* v. *Episcopal Diocese of Mass.*, *supra* (court lacked jurisdiction over disciplined minister's claims of defamation, conspiracy, civil rights violations, and negligence in connection with conduct of church disciplinary proceedings against him); *Williams* v. *Episcopal Diocese of Mass.*, *supra* (court lacked jurisdiction over priest's employment discrimination claim); *Madsen* v. *Erwin*, 395 Mass. 715, 724-725 (1985) (summary judgment in favor of church on employee's claim of wrongful discharge, where reason for discharge was employee's failure to abide by church's teachings on issues of sexuality). See also *EEOC* v. *Catholic Univ. of Am.*, 83 F.3d 455, 461 (D.C. Cir. 1996), and cases cited (free exercise clause of First Amendment "precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them").

Here, the court is not called on to resolve any dispute concerning Talbot's relationship with the Jesuits. Nothing in the doctrine of church autonomy deprives the court of subject matter jurisdiction over the underlying case, a criminal prosecution against Talbot for alleged sexual assaults. Nor does enforcement of the subpoena require the court to decide anything touching on "doctrine, canon law, polity, discipline, [or] ministerial relationships." *Williams* v. *Episcopal Diocese of Mass.*, *supra* at 579. See *Bollard* v. *California Province of the Soc'y of Jesus*,

196 F.3d 940, 946-948 (9th Cir. 1999) (free exercise clause does not prevent court from deciding claim of sexual harassment brought by Jesuit novice against his religious order, as resolution of claim would not interfere with church's freedom to select clergy). The mere examination of the Jesuits' documents concerning Talbot, which is all that the subpoena entails, does not infringe on the Jesuits' autonomous decision-making with respect to Talbot's fitness, discipline, assignments, or any other aspect of his relationship with the Jesuits. See *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. 854, 862 n.10 (1981) ("Examination of [ecclesiastical] documents is not, in and of itself, an impermissible intrusion into the religious realm . . . .").[6] "[A]pplying any laws to religious institutions necessarily interferes with the unfettered autonomy churches would otherwise enjoy, [but] this sort of generalized and diffuse concern for church autonomy, without more, does not exempt them from the operation of secular laws." *Bollard* v. *California Province of the Soc'y of Jesus, supra* at 948.

---

[6]Talbot and the Jesuits point to cases where the investigative phase of an agency enforcement proceeding was held an unconstitutional intrusion by the State into church affairs, suggesting that those cases stand for the proposition that any form of investigation, however slight, represents an unconstitutional intrusion. See *EEOC* v. *Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) (two-year investigation by EEOC of Title VII claim brought by professor denied tenure in university's department of canon law "constituted an impermissible entanglement with judgments that fell within the exclusive province of the [department] as a pontifical institution"); *Surinach* v. *Pesquera de Busquets*, 604 F.2d 73, 76-78 (1st Cir. 1979) (consumer affairs agency ordered parochial schools to produce documents and information concerning all aspects of schools' finances as part of agency review preparatory to imposition of cost controls; schools entitled to injunctive relief from orders to produce because "eventual use to which the school's cost information could be put could interfere seriously with [the school's] religious duties and objectives"). See also *NLRB* v. *Catholic Bishop of Chicago*, 440 U.S. 490, 501-504, 507 (1979) (because NLRB's assertion of jurisdiction over unfair labor practices charge against religious school would pose "significant risk" of violation of First Amendment to United States Constitution, including prohibited "inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission," Court interpreted National Labor Relations Act in manner that precluded NLRB jurisdiction). Such cases are readily distinguishable, as they involved extensive investigations that had, as their ultimate goal, regulatory control over religious institutions that was forbidden by the First Amendment. The Commonwealth's subpoena here does not seek to control or influence any aspect of the Jesuits' operation — it merely seeks information in the hands of the Jesuits that is relevant to determining whether one of its priests sexually assaulted his students.

The doctrine of "church autonomy" is not implicated by the enforcement of this subpoena.

b. *Burden on the free exercise of religion.* Talbot and the Jesuits claim that denying confidentiality to their communications, and denying confidentiality to the Jesuits' internal assessment of Talbot's fitness (including review of his treatment records), will have the effect of inhibiting the communications that are necessary to maintain the Jesuits' relationship with one of its own priests. As such, they contend, the mere review of the documents burdens their ability to practice their religion.

Under amendment art. 46, § 1, claims that the State is improperly burdening the free exercise of religion are assessed using a balancing test. *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 321-323 (1994).[7] We must determine whether the State action complained of (here, enforcement of the subpoena) "substantially burdens [the] free exercise of religion, and, if it does, whether the Commonwealth has shown that it has an interest sufficiently compelling to justify that burden." *Id.* at 322. The party claiming an unconstitutional burden on the free exercise of religion "must show (1) a sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the state requirement. Once the claimant has made that showing, the burden shifts to the state. The state can prevail only by

[7]Prior to *Employment Div., Dep't of Human Resources of Or.* v. *Smith*, 494 U.S. 872 (1990) (*Smith*), the Supreme Court had also used a balancing test to determine free exercise claims under the First Amendment, requiring the State to identify a compelling State interest that would outweigh the burden on the free exercise of religion. See *Wisconsin* v. *Yoder*, 406 U.S. 205, 214-215 (1972); *Sherbert* v. *Verner*, 374 U.S. 398, 406-409 (1963). In *Smith, supra* at 878, the Court rejected that approach, holding that if the burden on the free exercise of religion was "merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." However, in *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 321-322 (1994), this court decided that the compelling State interest balancing test was the test we would continue to use for purposes of art. 46, § 1. Using that test, "we extend protections . . . that are at least as great as those of the First Amendment." *Id.* at 322. Because we conclude that enforcement of the present subpoena would pass muster under the compelling State interest balancing test that we still use under art. 46, § 1, we need not separately address whether enforcement of the subpoena would violate the free exercise clause of the First Amendment.

demonstrating both that (3) the requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal." *Id.* at 322-323, quoting L. Tribe, American Constitutional Law § 14-12, at 1242 (2d ed. 1988).

Talbot and the Jesuits have met their burden of demonstrating that confidentiality in their communications and in their internal review of priests is based on a religious belief, and that a subpoena requiring them to divulge those materials would conflict with that belief. Their view, supported by logic as well as religious belief, is that confidentiality helps ensure that a priest will make honest disclosures to his superiors (as required by the tenets of their religious beliefs) and to his treatment providers (who are in turn keeping the priest's superiors informed of his treatment progress). There can be no question that confidentiality assists that process, and that depriving Talbot and the Jesuits of that confidentiality would thus conflict with, and burden, the methods chosen to foster and preserve their relationship within a religious order. We thus accept their argument that enforcement of the subpoena would impose some burden on the free exercise of their religion.[8]

Under the balancing test articulated in *Attorney Gen.* v. *Desilets, supra,* we next turn to the countervailing interests asserted by the Commonwealth. In conducting that balancing test, we do not consider the interest asserted as a general interest in law enforcement, but instead consider it in a manner "more focused" on the specific fact pattern at issue. *Id.* at 325. For example, in *Attorney Gen.* v. *Desilets, supra,* the defendants had declined to rent an apartment to an unmarried, cohabiting couple. Such cohabitation was contrary to the defendants' religious beliefs, and the defendants did not wish to facilitate

[8]We note, however, that the Jesuits have produced many documents revealing communications between Talbot and his superiors. Moreover, Talbot and the Jesuits have not pursued claims of privilege with respect to many documents that they previously asserted were protected by the State and Federal Constitutions. While issues of waiver are not before us, the strength of the asserted need for complete confidentiality is somewhat weakened by the production of documents that, equally with those still being withheld, reflect communications between Talbot and his superiors on the subject of Talbot's fitness as a priest.

conduct that they believed was sinful. In assessing whether the Commonwealth's interest in pursuing a claim of housing discrimination against the defendants was sufficiently compelling to outweigh the burden on the defendants' religious beliefs, the court did not look solely at the "general objective of eliminating discrimination of all kinds referred to in [G. L. c. 151B, § 4 (6)]." *Id.* Rather, the court considered the Commonwealth's interest in eliminating the particular type of discrimination in question — i.e., housing discrimination against an unmarried couple, *id.* at 325-326 — and, further, opined that resolution of the issue required specific information about whether there was, despite the defendants' religiously motivated refusal to rent, adequate rental housing still available for unmarried couples in that geographic location. *Id.* at 329, 331.[9] In other words, the State's assertion of a compelling interest, and the balancing of that interest against the burden imposed on the exercise of religion, is considered in a concrete, pragmatic, and fact-specific way.

We thus look at the specific State interests at stake in enforcing this particular subpoena, not at any more abstract or generalized State interest in obtaining testimony and documents in criminal prosecutions.[10] We first note that the State's interest in prosecuting these particular crimes (rape, assault with intent to

[9]As another example of a highly fact-specific application of the balancing test under the free exercise clause, see *Scott* v. *Rosenberg*, 702 F.2d 1263, 1273-1276 (9th Cir. 1983), cert. denied, 465 U.S. 1078 (1984). There, the government was investigating a religious broadcaster's utilization of donations, seeking to ascertain whether the broadcaster had committed fraud by way of various misstatements to potential donors. The broadcaster objected to discovery of the donation records (including records of his own pledges and donations) contending, inter alia, that the confidentiality of those contributions was a tenet of his religious beliefs. *Id.* at 1273. After considering the specific nature of the fraud being investigated, the context in which the fraud was allegedly committed (i.e., by use of broadcast facilities), the reliability of the information on which the investigation was launched, and the scope of the demand for records, the court concluded that the burden on the broadcaster's exercise of religion was outweighed by the government's compelling interests. *Id.* at 1274-1276.

[10]However, even viewed in the abstract, we recognize that the State's interest already qualifies as a strong one. See *Surinach* v. *Pesquera de Busquets*, 604 F.2d 73, 80 (1st Cir. 1979), and cases cited (noting that, for purpose of weighing State's compelling interest against burden on free exercise of religion, subpoena of records from religious institution for purposes of

rape, and assault and battery) is strong. Cf. *id*. at 327 (noting that "marital status discrimination is not as intense a State concern as is discrimination based on certain other classifications"). And, although the alleged victims were apparently above the age of consent, we are mindful that these crimes were allegedly committed against high school students by a person in authority over them at the school. The Commonwealth's interest in preventing sexual abuse of students ranks as exceptionally high. See *Scott* v. *Rosenberg*, 702 F.2d 1263, 1274 (9th Cir. 1983), cert. denied, 465 U.S. 1078 (1984) (government's "compelling interest in preventing the diversion of funds" justified discovery of confidential records of contributions to religious broadcaster).

Talbot and the Jesuits argue that the Commonwealth may rely on "good police work" to secure convictions in criminal cases, *Mockaitis* v. *Harcleroad*, 104 F.3d 1522, 1530 (9th Cir. 1997), and that production of documents from religious organizations is not necessary to pursuit of the Commonwealth's law enforcement goals. Again, however, we turn to the specifics of this case, not to general pronouncements about how law enforcement may be furthered by "good police work." If, as the Commonwealth suspects, the withheld documents contain damaging admissions by Talbot, the utility of such evidence cannot be matched by "good police work." Nothing in this record suggests that Talbot has made any statement or confession to the police.[11] And, again assuming that damaging admissions are contained in the withheld materials, they are not useful solely

---

"criminal investigation" presents "situation in which the state's interest unquestionably is strong").

[11]The dissenting opinions of Justices Spina and Cordy take the view that there is no compelling State interest in these documents unless they are "essential" to the pursuit of this particular prosecution, in effect meaning that the Commonwealth could have access to these materials only if it first made a showing that its case against Talbot was weak. In advance of trial, no matter the seeming strength of the Commonwealth's case, no one can predict whether this evidence — or any other single piece of evidence — will or will not be "essential" to obtain a conviction. The fact that the Commonwealth has succeeded in establishing probable cause to believe that Talbot committed these offenses, and thus has been able to obtain indictments without the documents it seeks, does not suggest that the Commonwealth will automatically be able to prove Talbot's guilt beyond a reasonable doubt and thereby obtain convictions without those documents. That the Commonwealth has at least some

for purposes of persuading a jury to convict — they can have a strong impact on plea negotiations, with the potential that two young victims of sexual abuse might be spared the ordeal of testifying at trial.[12] We are satisfied that the Commonwealth has a compelling interest in obtaining these documents, that there are no other avenues by which the Commonwealth could obtain the equivalent of these documents, and that those interests outweigh the claimed interest of keeping these communications confidential.[13]

evidence which, if believed, would establish each of the required elements of these offenses, does not lessen the Commonwealth's interest in obtaining more solid evidence for use at trial. The Commonwealth will have but one opportunity to try Talbot on these charges, and it has a compelling interest in presenting the strongest case it can during that one opportunity.

[12]While the Commonwealth has a compelling interest in trying to prove Talbot's guilt, it has an even more compelling interest in doing so without putting victims through the additional trauma that is inherent in having to testify about (and be cross-examined concerning) sexual assault. The dissenting opinions ignore this aspect of the Commonwealth's need for all available incriminating evidence against Talbot.

[13]In an attempt to alter the outcome of this balancing, Talbot and the Jesuits rely heavily on cases that have found government intrusion into a defendant's penitential confession an unconstitutional burden on the free exercise of religion. See, e.g., Mockaitis v. Harcleroad, 104 F.3d 1522, 1530-1531 (9th Cir. 1997) (surreptitious tape recording of inmate's confession to priest). See also Matter of Subpoena Served Upon Wood, 430 F. Supp. 41, 45-46 (S.D. N.Y. 1977) (enforcing subpoenas directed at church personnel, noting that subpoenas did not "pry into protected communications between a clergyman and his communicants"); Pagano v. Hadley, 100 F.R.D. 758, 760 (D. Del. 1984) (allowing discovery of church documents, but exempting documents protected by priest-penitent privilege). However, the claim of confidentiality based on the priest-penitent privilege, G. L. c. 233, § 20A, is not before us. Where a privilege has been conferred by statute, we need not consider whether the free exercise clause would also require recognition of such a privilege on constitutional grounds. If, as Talbot and the Jesuits claim, the communications between Talbot and his superiors constitute communications "seeking religious or spiritual advice or comfort" from a priest, G. L. c. 233, § 20A, the statutory privilege would protect those communications absolutely, without regard to any balancing test under a constitutional analysis. The judge below, having reviewed the documents, determined that they did not come within the ambit of G. L. c. 233, § 20A, and review of that aspect of the present petition is not part of the reported question.

Similarly, Talbot's interest in confidentiality of his communications with psychotherapists is one that would be protected by statute. G. L. c. 233, § 20B. The judge below held that that privilege had been waived by Talbot's own assent to sharing the records with his Jesuit superiors, and that the

c. *The establishment clause.* Talbot contends that enforcement of the subpoena would violate the establishment clause of the First Amendment ("Congress shall make no law respecting an establishment of religion . . ."). In order to pass muster under this prong of the First Amendment, the law in question must have a secular purpose, "its principal or primary effect must be one that neither advances nor inhibits religion," and it "must not foster 'an excessive government entanglement with religion.' " *Lemon* v. *Kurtzman*, 403 U.S. 602, 612-613 (1971), quoting *Walz* v. *Tax Comm'n of the City of N.Y.*, 397 U.S. 664, 674 (1970). We apply the same criteria for purposes of State constitutional analysis. See *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 558 (1979).

Talbot concedes that the statutes and rules authorizing the issuance of subpoenas are secular in purpose, but contends that they have the effect of inhibiting religion and would lead to excessive government entanglement with religion if they were enforced in this case. We disagree. With regard to the test of "effect" on religion, we must look at the law's "principal or primary effect," *Lemon* v. *Kurtzman, supra*, not at its incidental effects. Here, the alleged inhibition on religion is not a "principal or primary" effect of the subpoena, although it may, in a subtle way, provide some disincentive that would arguably discourage accused priests from being totally forthcoming with their superiors.[14] By comparison, for example, even the overtly religious practice of having a chaplain provide an opening invocation at legislative sessions was held not to have the advancement of religion as its "primary effect," as it was "unlikely to advance religious belief either among the legislators or their constituency." *Colo* v. *Treasurer & Receiver Gen.*,

---

privilege does not apply when diagnosis and treatment have been sought at the behest of an "employer" for purposes of "making employment decisions." Whether the sharing of confidential information with Talbot's Jesuit superiors constituted a "waiver" of the psychotherapist-patient privilege, and whether the Jesuits are properly considered to be Talbot's "employer," are not part of the reported question.

[14]Of course, the priest-penitent privilege, G. L. c. 233, § 20A, would still protect the confidentiality of accused priests making "confession" to or "seeking religious or spiritual advice or comfort" from another priest. We are, again, dealing solely with the effect of a subpoena on communications outside that statutory privilege. See note 11, *supra*.

*supra* at 559. The tendency of this subpoena duces tecum to influence anyone's religious beliefs is far more attenuated than that, and cannot be said to have as its "principal or primary" effect an impact on religious belief.

Nor does the enforcement of this subpoena result in any excessive government entanglement with religion. The court can decide issues of relevance, burdensomeness, and the applicability of the asserted privileges without having to decide matters of religion or embroil itself in the internal workings of the Jesuits. Indeed, the only form of "entanglement" with religion at issue in the motions to quash is a form that Talbot and the Jesuits have themselves invited, namely, the court's consideration whether Talbot's communications qualify for protection under the priest-penitent privilege, G. L. c. 233, § 20A. Assessment of the applicability of that privilege does not lead to excessive government entanglement in religion.

d. *Freedom of association.* Talbot and the Jesuits also contend that enforcement of the subpoena would burden Talbot's ability "to freely associate with his Jesuit [s]uperiors." We are unpersuaded. "The right to freedom of association necessarily encompasses the right to 'privacy in one's associations' including religious associations." *Attorney Gen.* v. *Bailey,* 386 Mass. 367, 380, cert. denied, 459 U.S. 970 (1982), quoting *NAACP* v. *Alabama,* 357 U.S. 449, 462 (1958). There is no issue of "privacy" with respect to the identity of persons with whom Talbot has associated for purposes of the practice of his religion — the privilege log itself, and the affidavits in support of the motions to quash, already identify the persons with whom Talbot communicated. Nothing in either party's motion to quash has sought to keep private the identities of any members of the Jesuits to whom Talbot may have spoken, or the identities of Talbot's treatment providers at the institute. Moreover, "compelled disclosure of membership in religious organizations only violates the right of freedom of association if it brings adverse consequences on the members," and even where such adverse consequences exist, disclosure can still be required if it serves a compelling State interest. *Attorney Gen.* v. *Bailey, supra* at 380, 381. Here, there are no "adverse consequences" to anyone merely from his affiliation or association with the

Jesuits, and nothing in the enforcement of this subpoena will penalize or inhibit anyone from associating with the Jesuits.

e. *Freedom of worship under art. 2.* Finally, Talbot and the Jesuits contend that forced disclosure of these materials violates the absolute protection accorded to religious beliefs and manner of worship by art. 2 of the Declaration of Rights: "[N]o subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping GOD in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship."

Except for the two exceptions stated in art. 2 (disturbing the peace or obstructing the worship of others), neither of which is applicable here, protections under art. 2 are absolute. See *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 332, 333 (1994); *Opinion of the Justices*, 214 Mass. 599, 601 (1913). Seeking to obtain that absolute protection (and thus avoid the balancing test that applies to claims involving the free exercise of religion under art. 46, § 1), Talbot and the Jesuits argue that the freedom of belief accorded under art. 2 must also entail the freedom to act in accordance with those beliefs. Specifically, they contend that Talbot's acts of confiding in his superiors, and allowing them to see records of his psychiatric treatment, were acts "undertaken in furtherance of the expression of his vows and religious commitment to the [Jesuits]" and that art. 2 should confer absolute protection on them.

This expansive reading of art. 2 would conflate it with the free exercise clause of art. 46, § 1, and effectively render the free exercise clause superfluous. Religious beliefs — what a person thinks, what faith he holds in his heart and mind — are indeed protected absolutely. Conduct in furtherance of those beliefs, however, is the "exercise" of religion, and government infringements on religiously inspired conduct are permissible if they satisfy the compelling State interest balancing test. *Attorney Gen.* v. *Desilets, supra* at 321-323. If accepted, the theory advanced by Talbot and the Jesuits would obliterate the important distinction between the absolute freedom of religious belief and the somewhat qualified free exercise of religion.

Article 2 also grants protection to that specific aspect of the

exercise of one's religion that constitutes "worshipping GOD in the manner and season most agreeable to the dictates of his own conscience." Under that prong of art. 2, one is free to "worship[]" in any form, as long as that form of "worship[]" does not disturb the peace or obstruct the worship of others. We have not had occasion to distinguish between what conduct qualifies for the essentially absolute protection of "worship[]" under art. 2 as opposed to other religiously motivated conduct that would qualify for protection under the balancing test we use for purposes of art. 46, § 1. Again, however, if all actions taken based on religious belief qualified as "worship[]" under art. 2, the free exercise clause of art. 46, § 1, would be superfluous. Instead, the essentially absolute protection of art. 2 appears directed at the ritual and ceremonial aspects of "worship[]."[15] The first sentence of art. 2 uses the term "worship" in that context: "It is the right as well as the duty of all men in society, *publicly, and at stated seasons to worship* the Supreme Being, the great Creator and Preserver of the universe" (emphasis added). The right to freedom in the "manner and season" of one's "worshipping GOD" conferred in the second sentence of art. 2 presumably refers to "worship[]" in that same context, and art. 2 has been applied in that context. See *Society of Jesus of New England* v. *Boston Landmarks Comm'n*, 409 Mass. 38, 42 (1990) (statute requiring commission's approval for redesign of interior of church violated art. 2, as it attempted to regulate design of "the church's actual worship space"). Cf. *Opinion of the Justices*, 333 Mass. 783, 784, 790 (1955) (proposed historic district legislation requiring commission approval of any reconstruction or alteration affecting exterior of buildings could constitutionally be applied to structures used for religious purposes). But see *Attorney Gen.* v. *Desilets, supra* at 337 n.3 (Liacos, C.J., concurring) ("an act of worship [protected by art. 2] could be any act by which a person, in his belief, shows honor or reverence to the object of his worship"). The production of documents in response to this subpoena does not "hurt,

---

[15]By comparison, "[c]onduct motivated by sincerely held religious convictions will be recognized as the exercise of religion," and thus protected under art. 46, § 1, "even when the conduct in dispute is not commonly viewed as a religious ritual." *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 323 (1994).

molest[], or restrain[]" the Jesuits or Talbot in their performance of any religious rituals or ceremonies of worship.[16] We therefore conclude that enforcement of the subpoena will not result in any violation of art. 2.

4. *Conclusion.* Having concluded that forced disclosure of the documents sought would not violate the free exercise clause of the First Amendment, art. 2, or art. 46, § 1, we therefore answer the reported question in the negative. The cases are remanded to the single justice for further proceedings consistent with this opinion.

*So ordered.*

Spina, J. (dissenting, with whom Cowin and Cordy, JJ., join). Because the court minimizes the burden on the right of the Society of Jesus of New England (Jesuits) and James F. Talbot to free exercise of religion, and because the Commonwealth has failed to demonstrate that enforcement of the subpoena duces tecum is the least restrictive means of achieving its goal of prosecuting the crimes at issue, I respectfully dissent.

Article 46, § 1, of the Amendments to the Massachusetts Constitution, amending art. 18 of the Amendments, provides, "No law shall be passed prohibiting the free exercise of religion," and thus parallels the First Amendment to the United States Constitution ("Congress shall make no law . . . prohibiting the free exercise [of religion] . . ."). See *Commonwealth* v. *Nissenbaum*, 404 Mass. 575, 578 & n.3 (1989). "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion . . . ." *Bowen* v. *Roy*, 476

---

[16]The only aspect of the documents that arguably touches on the performance of "worship[]" is a reference in a memorandum (document 28) to the fact that, early on in his initial meeting with Talbot, Reverend Murray said a brief prayer. Praying would presumably qualify as a form of "worship[]" protected by art. 2, but nothing in the enforcement of this subpoena would inflict any burden or restraint on prayer. The memorandum in question does not recite or even allude to the contents of Reverend Murray's prayer, revealing only that it was "short." The fact that the meeting began with a prayer is referenced in Talbot's own brief, and enforcement of the subpoena will disclose nothing more about that moment of prayer than has already been disclosed by way of briefing.

U.S. 693, 700 (1986). As the court correctly notes, we analyze free exercise claims under art. 46, § 1, using the balancing test employed by the United States Supreme Court before its decision in *Employment Div., Dep't of Human Resources of Or.* v. *Smith,* 494 U.S. 872 (1990) (*Smith*), "a much criticized opinion that weakened First Amendment protections for religious conduct." *Attorney Gen.* v. *Desilets,* 418 Mass. 316, 321 (1994). See *Abdul-Alázim* v. *Superintendent, Mass. Correctional Inst., Cedar Junction,* 56 Mass. App. Ct. 449, 453-454 & n.8 (2002).

First we examine the burden, if any, that is placed on free exercise by the proposed government action. Burden "looks to the degree that the government's requirement will, directly or indirectly, make the believer's religious duties more difficult or more costly." L. Tribe, American Constitutional Law § 14-12, at 1247 (2d ed. 1988) (Tribe). "Where the requirement is inherently incompatible with the adherent's religious duty, the case for an exemption is stronger than where the requirement simply makes following the religious duty more costly." *Id.* at 1247 n.37.

Acknowledging that the tenets of their religious faith require Jesuit priests to make honest disclosures to their superiors, the court recognizes that "confidentiality assists that process," and further, that deprivation of that confidentiality conflicts with "the methods chosen to foster and preserve their relationship within a religious order." *Ante* at 670. The court therefore accepts the argument by Talbot and the Jesuits that forcing disclosure of the contents of the letters would impose "some" burden on the free exercise of their religion. *Id.*

The court's concession, however, fails to consider the chilling effect such disclosure could have on the methods used to conduct internal church investigations and disciplinary procedures. As the court recognizes, "confidentiality in . . . [the Jesuits'] internal review of priests is based on a religious belief."[1] *Id.* Such an internal inquiry requires that the priest whose conduct is at issue be able to speak fully and freely to his superiors. While acknowledging the burden on the free

---

[1] The Commonwealth does not contend otherwise. See *Abdul-Alázim* v. *Superintendent, Mass. Correctional Inst., Cedar Junction,* 56 Mass. App. Ct. 449, 451 n.5 (2002).

exercise rights of the priest, the court overlooks the fact that superiors too may be reluctant to undertake such an investigation and demand full disclosure if they know that any confidential information gained in the course of their inquiry may be divulged by force of a government subpoena. See *Mockaitis* v. *Harcleroad*, 104 F.3d 1522, 1530 (9th Cir. 1997) ("the knowledge, belief, or suspicion that freely-confessed sins would become public would operate as a serious deterrent to participation in the sacrament and an odious detriment accompanying participation"). Such an unfortunate result, in my opinion, adds weight to the burden on the Jesuits' right to religious free exercise. See *id.* (asserting that secret recording of jailhouse confession substantially burdens priest's exercise of religion). Cf. *Attorney Gen.* v. *Desilets*, *supra* at 331 ("It should be remembered that the task is to balance the State's interests against the nature of the burden on the defendants and that we are concerned here with the business of leasing apartments, not with participation in a formal religious activity").

Turning to the "compelling interest" aspect of the test, it is important to keep in mind that "[t]he state may justify an inroad on religious liberty by showing that it is *the least restrictive means* of achieving some compelling state interest." *Thomas* v. *Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981). "[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin* v. *Yoder*, 406 U.S. 205, 215 (1972). The court identifies the "specific State interests at stake," *ante* at 671, as first, prosecuting the crimes of rape, assault with intent to rape, and assault and battery, and second, preventing sexual abuse of high school students.[2] *Ante* at 671-672. In the very next paragraph, however, the court states that "the Commonwealth has a compelling interest in obtaining these documents." *Ante* at 673. In note 11, the court refers to the Commonwealth's "interest in obtaining more solid evidence for use at trial," and its "compelling interest in presenting the strongest

---

[2] The alleged crimes occurred between 1977 and 1979, according to the indictments.

case it can."[3] Finally, in note 12, the court identifies yet another, "even more compelling" interest: that of sparing victims the trauma of having to testify as to an alleged sexual assault. Such a shift in the identity of the State's interest affects dramatically whether or not such interest may be characterized as "compelling."[4] If the government's interest is in getting its hands on the secret documents, then keeping them impounded would indeed "substantially hinder fulfillment of the goal" — thus rendering the nature of such an interest more compelling. See *Attorney Gen.* v. *Desilets*, *supra* at 322-323, quoting Tribe, *supra* at 1242. If the compelling State interest is in keeping alleged victims of sexual assault from having to undergo the ordeal of taking the witness stand, then any lawful tactic that would impel a defendant to plead guilty would be permissible. If, however, the government's interest is in prosecuting the above-specified crimes, as I believe it is, then keeping the documents secret would not substantially hinder that goal, because many, if not most, assaults — sexual and otherwise — are prosecuted without benefit of access to such documents.

Attempting to justify its use of the subpoena as a tool to establish Talbot's guilt, the Commonwealth argues that it has not "placed any listening devices or undercover detectives" at Talbots current residence "in an effort to somehow obtain a confession." However, the fact that the subpoena is less restrictive than these techniques does not make it the least restrictive means.

The court also states, without citation to any authority, that "there are no other avenues by which the Commonwealth could obtain *the equivalent* of these documents" (emphasis added). *Ante* at 673. It arrives at this conclusion with no discussion of

---

[3]These references seem to conflict with the court's earlier assertion that it is focusing on "the specific State interests at stake in enforcing this particular subpoena, *not at any more abstract or generalized State interest in obtaining testimony and documents in criminal prosecutions*" (emphasis added). *Ante* at 671.

[4]Likewise, the Commonwealth in its brief identifies the "compelling" State interest, variously, as "providing all the relevant evidence to a jury in the trial of a criminal case," "prosecuting [Talbot] for rape and sexual assault of students in his charge," and "upholding the rape laws."

the standard that it employed. The standard that should be applied is whether the documents are essential to the prosecution, see *United States* v. *Lee*, 455 U.S. 252, 257-258 (1982), not whether there are no other avenues by which these documents or their equivalent may be obtained. If it were the latter, then art. 46, § 1, it seems, would always fail. Indeed, entitling the government to obtain constitutionally protected information that could result in such a strong case that the defendant is impelled to plead guilty, simply eviscerates the protection that art. 46, § 1, aims to provide. Under pre-*Smith* jurisprudence, the United States Supreme Court required "that when a state chooses to attain its goals in a way which imposes a burden upon the free exercise of religion, the state must show . . . '[that method] is *essential* to accomplish an overriding governmental interest,' [*United States* v. *Lee, supra*] (emphasis added)." *New Life Baptist Church Academy* v. *East Longmeadow*, 885 F.2d 940, 946 (1st Cir. 1989). See *Thomas* v. *Review Bd. of the Ind. Employment Sec. Div., supra*; *Wisconsin* v. *Yoder, supra*. See also *Sherbert* v. *Verner*, 374 U.S. 398, 406-409 (1963). This is the standard articulated by the United States Supreme Court when it employed the balancing test that Massachusetts still uses. The Commonwealth simply has not shown that the documents at issue are essential to prosecuting its case against Talbot.

"[T]he free exercise clause may require religion-based exemptions to criminal procedures. . . . The issue is not the propriety of government's prosecuting [clergy], but rather the means by which government gathers its evidence." Tribe, *supra* at 1270. Here, the State may gather its evidence using other, less restrictive techniques available to law enforcement. See *Mockaitis* v. *Harcleroad, supra* at 1530 ("the ordinary means of proving a case by good police work were 'the least restrictive means' of furthering the prosecutor's desirable goal"). See also *Attorney Gen.* v. *Desilets, supra* at 331. The court, however, concludes that the State's interests in disclosure "outweigh the claimed interest of keeping these communications confidential." *Ante* at 673. In my opinion, the Commonwealth could substantially achieve its laudable goals of prosecuting rape and preventing sexual abuse of students through means less restrictive than compelling production of confidential exchanges — undisput-

edly mandated by religious tenets — between a priest and his superior.

CORDY, J. (dissenting, with whom Spina and Cowin, JJ., join). I concur in Justice Spina's view that, in employing the balancing test to analyze the free exercise claim asserted here, the court minimizes the chilling effect the subpoena at issue will have on the ability of the Society of Jesus of New England (Jesuits) to conduct internal inquiries into the fitness of its priests for ministry service. I write separately to express my view that the "specific State interests at stake," *ante* at 671, do not, in the circumstances of this case, present a compelling State interest in obtaining church records documenting communications between James F. Talbot and his superiors regarding his service and future as a priest.

There is no doubt that the Commonwealth has a compelling interest in prosecuting sexual assaults committed by adults, and particularly assaults committed by teachers on the students with whose care they are entrusted. There is, however, no claim here that such a prosecution will be thwarted without access to these otherwise confidential communications, nor could there be. To the contrary, the Commonwealth conducted its criminal investigation of Talbot, apparently with the cooperation of the Jesuits to the extent such cooperation did not threaten to impair its function as a religious establishment, and that investigation resulted in the return of the indictments now pending in Suffolk County. The subpoenaed documents were obviously not necessary to the investigation, and no claim has been made that the Commonwealth's case depends on them or that the trial cannot take place without them.

The Commonwealth has subpoenaed the questioned documents in the hope that there might be an admission somewhere within them that it can use as added evidence at trial. If there is none, the case will not be dismissed, and will presumably be based, as most criminal cases are, on the testimony of witnesses, including any alleged victims of the charged sexual assaults. If Talbot made incriminating or inconsistent statements to police, other teachers, students, or parents, such evidence will also be admissible. The Commonwealth, understandably, will always want to know if there is more evidence it might

obtain, but that does not make its ambition to get access to any possible evidence, necessary to the fulfilment of the Commonwealth's "compelling interest" to prosecute certain types of crimes, nor does it make obtaining the additional evidence a "compelling interest" in and of itself.[1] What is compromised, on the other hand, lies close to the heart of the "methods chosen [by the Jesuits] to foster and preserve their relationship within a religious order," *ante* at 670, the requirement that Jesuit priests make honest disclosures to their superiors.[2]

Today's environment has been poisoned by a sexual abuse scandal of unimaginable proportions, that some officials of the Roman Catholic church attempted for decades to keep hidden from public view. In this environment, it is understandable that any claim regarding the need for confidentiality in communications between priests and their religious superiors would be looked on with a jaundiced eye. Efforts underway both from within and without the church have begun to assess and remedy what went wrong.[3] As a court, we must not allow the terrible circumstances of today to undermine the important principle of religious freedom for tomorrow. In the absence of a need more compelling than the Commonwealth has demonstrated here, I would conclude that to the extent the subpoena seeks documents regarding communications between a Jesuit priest and his superior, made or required for the purpose of disciplining or assessing that priest's fitness for present or future ministry, it exceeds the bounds of the constitutional protections afforded religious organizations and should be quashed.

---

[1] This is not a case where the communications between Talbot and his superiors are themselves part of the criminal conduct. Nor is this a case where an integral element of a criminal act or scheme cannot be proved without the information sought. A different case might be presented if this were a criminal prosecution for the failure to report child abuse as required by G. L. c. 119, § 51A, where proving the existence and receipt of the information recorded in the documents was necessary to proving the offense.

[2] It is not contended that this requirement is the product of anything other than religious belief and practice: we are not confronted with methods or procedures adopted solely for the purpose of frustrating the Commonwealth's legitimate interest in prosecuting criminal conduct.

[3] See, e.g., St. 2002, c. 107, amending G. L. c. 119, § 51A, that adds various church officials to the list of mandatory reporters of abuse.