Opinión disidente emitida por el
Juez Asociado Señor Estrella Martínez.
De forma prematura, a ciegas y en el vacío, una Mayoría de este Tribunal establece mecanismos predirigidos que tendrán el efecto de liberar al Obispo de la Iglesia Católica de Arecibo de entregar una buena parte de la información requerida por el Departamento de Justicia, al peligrosamente conceder un poder de veto a determinados adultos, sin que ningún tribunal haya revisado previamente todos los documentos pertinentes.
Por entender que los fundamentos y el procedimiento contenido en este disenso permitirían lograr, en esta etapa procesal, un justo balance entre los derechos constitucionales de los individuos y el interés apremiante del Estado en procesar a los depredadores sexuales, DISIENTO.
Indiscutiblemente, esta Curia está llamada a resolver una controversia en la que se entretejen y enfrentan intereses que revisten gran preeminencia en nuestra sociedad. De un extremo de la balanza se halla el Estado en un intento por soslayar un reclamo de inconstitucionalidad, amparándose en que sus acciones persiguen un interés apremiante y que su quehacer cumple cabalmente con su misión de pro *381 cesar los casos de naturaleza penal. Mientras, del otro lado de la balanza se encuentran funcionarios del clero y un ciudadano interventor, quienes cuestionan las acciones del Estado e invocan garantías constitucionales para detenerlas, tales como: la libertad de culto, la separación Iglesia y Estado, y el derecho a la intimidad.
Hay quienes plantean que las garantías de estirpe constitucional y la seguridad pública son intereses mutuamente excluyentes y que se encuentran en un estado de tensión permanente. Precisamente, en el caso ante nos pudimos haber resuelto esa aparente tensión entre los postulados sociales y comunitarios en que se fundamenta la seguridad pública y las protecciones constitucionales que amparan a los ciudadanos. Para cumplir con esa aspiración, no debemos permitir que, en esa lucha por tirar de la soga, el Estado derribe protecciones de rango constitucional sacrificándolas en el altar de la seguridad pública. A su vez, tampoco podemos dar paso a que el interés del Estado, para investigar a los trasgresores de nuestro precepto penal, sea sacrificado en el altar de la religión.(1)
Ante esa realidad, el rol del Poder Judicial debe consistir en procurar que, de ser posible, queden en pie tanto el interés del Estado en procesar a los infractores de las leyes penales, así como los derechos constitucionales que cobijan a los ciudadanos. En el descargo de esa responsabilidad, no podemos actuar a ciegas, prematuramente, ni dirigir por control remoto al foro de instancia para buscar que la soga se arrime a una parte específica. Por entender que ese es el curso de acción en Derecho que impediría que, de forma improcedente, alguna de las partes tire de la soga para su lado, disiento.
Precisada la controversia en esos contornos, pasamos a trazar el contexto fáctico y procesal que dio margen a ésta.
*382 I
La controversia de epígrafe tuvo su génesis el 12 de febrero de 2014, cuando el Obispo de la Diócesis de Arecibo (Diócesis), Daniel Fernández Torres (Obispo) y el Vicario General, Luis Colón Rivera (Vicario General), incoaron una demanda ante el Tribunal de Primera Instancia con el propósito de impugnar sendos subpoenas emitidos por el Departamento de Justicia de Puerto Rico (Departamento).(2) En esencia, solicitaron una sentencia declaratoria y la concesión de un interdicto preliminar y permanente. Ello, a fin de que el foro judicial decretara la inconstitucionalidad de los subpoenas y, a su vez, impidiera la entrega de los expedientes y documentos requeridos por el Departamento.
Los demandantes alegaron que la actuación del Estado es el resultado de una serie de investigaciones eclesiásticas internas que la Diócesis efectuó. Estas investigaciones se produjeron con el propósito de atender ciertas quejas de conducta impropia contra sacerdotes de la región de Arecibo. Sobre el particular, los demandantes argüyeron que las pesquisas fueron conducidas a tenor con los postulados del Derecho Canónico y que, al momento de realizarlas, los querellantes eran mayores de edad, para efectos de la ley penal.(3) *383 Argumentaron que, como parte del trámite de las investigaciones y las normas que las regulan, a los testigos y las víctimas se les garantizó entera confidencialidad y privacidad. En respuesta al requerimiento que le hiciera el Estado, informaron que el 6 de febrero de 2014, entregaron toda aquella información que, a su mejor entender, era relevante y pertinente y no quebrantaba la confidencialidad y privacidad que se les garantizó a los denunciantes.
En lo pertinente, el Obispo y el Vicario General enmarcaron su reclamación en varios fundamentos, a saber: (1) la libertad de culto; (2) la separación de Iglesia y Estado; (3) el derecho a la intimidad y expectativa de privacidad de la Diócesis en relación con sus documentos y procesos internos de investigación; (4) el derecho de intimidad de las víctimas denunciantes con respecto a las declaraciones de eventos de naturaleza sexual que expresaron ante la Diócesis y el proceso de sanación emocional y espiritual por el cual atravesaron, y (5) el privilegio religioso-creyente estatuido en la Regla 511 de Evidencia de 2009 (Regla 511), 32 LPRAAp. VI.
De igual forma, los demandantes argüyeron que dar paso a la investigación y entrega de los documentos solicitados produciría un efecto paralizante (chilling effect) tanto en la facultad de la Diócesis para disciplinar a aquellos clérigos que incurran en prácticas impropias, como en la forma de auxiliar a los feligreses que han sido víctimas de este tipo de actuación. Para los demandantes, la divulgación de la información requerida por el Departamento, la cual sostienen fue expresada bajo un entendido de confidencialidad, frustraría la confianza de los feligreses en la institución religiosa.
El 19 de febrero de 2014, DJMG (Interventor) presentó ante el foro de instancia una Demanda de Intervención. En ésta, expresó que actualmente tiene veintitrés años de edad y que entre los doce y quince años fue abusado sexualmente por un sacerdote de la jurisdicción de Arecibo. Indicó que *384 hace aproximadamente tres años denunció ese hecho ante la Diócesis, pues entendió que debía resolverse internamente y conforme a los postulados del Derecho Canónico. El Interventor informó que se le proveyó ayuda psicológica y que quedó satisfecho con los esfuerzos realizados por la Diócesis. En ese sentido, adujo que no le interesó, ni le interesa, que lo denunciado ante la institución religiosa sea investigado y procesado por las autoridades civiles. Con respecto a la denuncia hecha ante la Diócesis, alegó que lo hizo movido por la estricta confidencialidad que cobija el proceso eclesiástico y el dogma de la Iglesia Católica. Además, sostuvo que todas las comunicaciones sobre su experiencia fueron dirigidas a un miembro del clero religioso, sin la presencia de personas ajenas a la institución.
Ante ello, el Interventor solicitó que se anularan los subpoenas emitidos y se prohibiera tanto la divulgación de su identidad y circunstancias personales, como las comunicaciones confidenciales que emitió ante la Diócesis. De forma similar al Obispo y al Vicario General, fundamentó su reclamo en lo siguiente: (1) el derecho a la intimidad; (2) la inviolabilidad de la dignidad humana; (3) la libertad de culto, y (4) el privilegio religioso-creyente.
Por su parte, el 20 de febrero de 2014, el Estado Libre Asociado (ELA) solicitó la desestimación de la demanda original y la reclamación del Interventor. Esencialmente, el ELA alegó que procedía la desestimación de la demanda al amparo de la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, y que los peticionarios no cumplían con los criterios de legitimación activa para invocar derechos de terceros. De igual forma, argüyó que el injunction solicitado era improcedente, toda vez que buscaba impedir una actuación de un funcionario público autorizada por ley.
Sobre este último planteamiento, el ELA argumentó que el Secretario de Justicia (Secretario) tiene potestad para investigar y procesar los casos de naturaleza penal en nuestra jurisdicción, por lo que el caso de epígrafe no era una *385 excepción. Por lo tanto, adujo que la negativa de entregar la información requerida constituía una limitación al poder investigativo del Estado. Ello, pues, su intención no es realizar intromisiones indebidas en los procesos intrínsecos de la iglesia, sino investigar aquella conducta constitutiva de delito para lo cual tiene autoridad y obligación expresa. Para el ELA, la investigación de un delito no puede considerarse un asunto interno de la iglesia.
En relación a los subpoenas emitidos, el ELA sostuvo que éstos superan los ataques de inconstitucionalidad, ya que persiguen un interés gubernamental apremiante (detectar y combatir el abuso sexual contra seres humanos) y el efecto sobre la práctica religiosa es meramente incidental. Asimismo, señaló que la acción estatal es de carácter neutral, de estricto contenido secular y de aplicabilidad general, pues constituye un proceso ordinario uniforme. Para el ELA, los subpoenas emitidos no imponen cargas impermisibles en las creencias o prácticas religiosas de los demandantes. En lo concerniente al reclamo de confidencialidad, sostuvo que cuenta con un procedimiento dirigido ex-presamente a salvaguardar la confidencialidad de los documentos requeridos por el Departamento.
De igual forma, el ELA se opuso a la demanda de intervención. Principalmente, argumentó que ésta no cumplía con los requisitos mínimos establecidos en las Reglas de Administración del Tribunal de Primera Instancia. En relación al fundamento de la aplicabilidad de la Regla 511, adujo, en lo pertinente, que el privilegio no puede tener el alcance de limitar una investigación criminal de abuso sexual. El ELA sostuvo que esa regla no goza de rango constitucional, por lo que debe ser interpretada restrictivamente. A base de ello, concluyó que el privilegio estatuido en la Regla 511 solo debe extenderse a la confesión sacramental y no más allá.
Luego de varios trámites procesales, el 7 de abril de 2014, el Tribunal de Primera Instancia emitió una senten *386 cia mediante la cual declaró la constitucionalidad de los subpoenas en cuestión. Concluyó que procedía la entrega de todos los documentos requeridos por el Departamento, con la única excepción de las comunicaciones emitidas durante el sacramento de la confesión, por éstas ser privilegiadas al amparo de la Regla 511. Asimismo, ordenó al Obispo y al Vicario General entregar, en un término de quince días a partir de la notificación de la Sentencia, los documentos solicitados. En desacuerdo con el dictamen, los demandantes presentaron un escrito intitulado “Moción para que se formulen determinaciones de hechos y conclusiones de derecho adicionales y en solicitud de reconsideración”, la cual fue declarada “no ha lugar”.
Inconformes, el 25 de abril de 2014, los demandantes, conjuntamente con el Interventor, acudieron al Tribunal de Apelaciones mediante recurso de apelación. A su vez, el 28 de abril de 2014, presentaron una moción en auxilio de jurisdicción en la cual solicitaron la paralización de los efectos de la sentencia emitida hasta que se resolviera el recurso de apelación presentado. El 2 de mayo de 2014, el foro apelativo denegó la paralización solicitada.
Entretanto, ese mismo día, el Obispo y el Vicario General, en conjunto con el Interventor, presentaron ante este Tribunal una Petición de certificación intrajurisdiccional. En esencia, los demandantes reproducen los argumentos esgrimidos ante los foros apelados. Conjuntamente con su petición, solicitaron la paralización de los efectos del dicta-men emitido por el foro primario. En atención a lo anterior, el 7 de mayo de 2014, esta Curia emitió una Resolución en la que declaramos “con lugar” ambas peticiones y, a la misma vez, le ordenamos a las partes presentar sus alegatos en un término de quince días.
Ambas partes han cumplido con nuestra orden, por lo que solo nos resta pasar a resolver la controversia suscitada. Procedemos.
*387 II
Con el fin de adjudicar el asunto ante nuestra consideración, es imperativo exponer el marco estatutario y jurídico aplicable. Veamos.
Es norma ampliamente conocida que en nuestro ordenamiento jurídico las agencias administrativas gozan de un gran poder de investigación. La adquisición de información se considera imprescindible, pues permite que las agencias puedan asegurar la consecución necesaria para el uso racional de sus poderes sustantivos. Esto, con el fin de atender y resolver los problemas que enfrenta nuestro ordenamiento y asegurar que la política pública vigente se implante de manera adecuada. Weber Carrillo v. ELA et al., 190 DPR 688 (2014); H.M.C.A. (P.R.), Inc., etc. v. Contralor, 133 DPR 945, 959 (1993).
Aunque lo usual es que las agencias obtengan la información solicitada de forma voluntaria, se les ha delegado, mediante legislación, el poder para obligar a las personas a que entreguen la documentación requerida. Empero, sabido es que el poder de investigación de las agencias no es irrestricto. Ello, pues, resulta incuestionable que el poder inquisitivo de las agencias puede transformarse en un instrumento de hostigamiento y persecución. En consecuencia, esta Curia ha resuelto que para dirimir la razonabilidad de un requerimiento administrativo deben concurrir varias circunstancias, a saber: (1) que la investigación esté en la autoridad conferida por ley a la agencia; (2) que el requerimiento no sea demasiado indefinido, y (3) que la información solicitada sea razonablemente pertinente al asunto específico bajo investigación. RDT Const. Corp. v. Contralor I, 141 DPR 424, 433 (1996); HMCA (PR), Inc., etc. v. Contralor, supra, pág. 970.
Inicialmente, la determinación de pertinencia queda a la discreción del funcionario que realiza la investigación *388 administrativa. Ahora bien, de surgir alguna polémica al respecto, esta determinación le compete a los foros judiciales, pues son éstos los últimos intérpretes de la compatibilidad entre el ejercicio del poder investigativo gubernamental y las garantías constitucionales. HMCA (PR), Inc., etc. v. Contralor, supra, pág. 970. Sin duda, esta función de los foros judiciales es trascendental, ya que el poder investigativo de las agencias no puede quedar al margen de los postulados y garantías constitucionales que amparan a las personas frente a las actuaciones del Estado.
III
Cónsono con el marco jurídico expuesto, a una agencia como el Departamento de Justicia se le reconoce un amplio poder para llevar a cabo investigaciones. Conviene recordar que el Secretario de Justicia es el principal funcionario de ley y orden del Estado Libre Asociado y es el llamado a dirigir esta agencia administrativa, creada en virtud del Art. IV, Sec. 6, de la Constitución de Puerto Rico, LPRA, Tomo 1. En síntesis, entre las funciones principales de este funcionario está el promover el cumplimiento y la ejecución de las leyes, así como investigar y encausar cualquier violación a las leyes penales. Véase Pueblo v. Castellón, 151 DPR 15, 24-25 (2000).
La potestad de investigar del Secretario está formalmente establecida en el Art. 11 de la Ley Orgánica del Departamento de Justicia, Ley Núm. 205-2004 (Ley Núm. 205), 3 LPRA see. 291 et seq. En lo pertinente, el referido artículo dispone que el Secretario o sus funcionarios tienen autoridad para realizar “las investigaciones que sean necesarias y adecuadas para el ejercicio de sus facultades [...] y quedan autorizados para entrevistar testigos y tomar juramentos y declaraciones”. 3 LPRA sec. 292h. Asimismo, el Art. 11 faculta al Secretario y a sus funcionarios a emitir *389 citaciones y requerir la comparecencia de testigos y la presentación de evidencia documental y de aquella otra que consideren esencial para el conocimiento cabal del asunto bajo investigación. Id. Se advierte que la persona que sea citada como testigo en una investigación o procedimiento realizado por el Departamento tiene la obligación de comparecer y testificar, o de presentar la evidencia que se le requiera. 3 LPRA sec. 292i. Todo ello, claro está, salvaguardando las garantías constitucionales y los derechos de los individuos.
En la consecución de su facultad para investigar, el Secretario puede extender subpoenas cuando lo entienda razonablemente necesario. El diligenciamiento de estos mecanismos en el contexto de una investigación penal tiene el propósito de adelantar el interés del Estado en la investigación y procesamiento criminal de los acusados, con el fin de velar por la seguridad de los ciudadanos. Así las cosas, el Secretario puede emitir citaciones dirigidas a obtener testimonios {subpoena ad testificandum), así como citaciones para la producción de documentos {subpoena duces tecum). Ambos instrumentos se consideran de vital importancia para que las agencias, y en particular el Departamento, puedan dar fiel cumplimiento a las funciones que le han sido delegadas. Weber Carrillo v. ELA et al., supra, pág. 1.
En cuanto a las citaciones para obtener documentos {subpoena duces tecum), recientemente reiteramos que cuando la información está en manos de un tercero y la persona afectada tiene una expectativa de intimidad sobre esta, la agencia tiene la obligación de notificarle a la persona afectada que se ha hecho el requerimiento al tercero como garantía constitucional. En cambio, cuando la persona agraviada es la que tiene la información en su poder, el requerimiento que se le extienda a ésta constituye suficiente notificación. Id., pág. 18.
*390 IV
En lo que atañe a las garantías y salvaguardas que amparan a las personas que suministren la información solicitada, ya sea mediante el uso de subpoena ad testificandum, o el subpoena duces tecum, recordemos que en el Art. 13 de la citada Ley Núm. 205 se dispone, en lo pertinente, que “la información obtenida como resultado de una investigación realizada es confidencial y debe mantenerse en un expediente investigativo, el cual no puede ser objeto de inspección, examen ni divulgación mientras se conduce la investigación”. 3 LPRA sec. 292j.
Por su parte, el Reglamento Núm. 7450 del Departamento(4) precisa la normativa con respecto a la divulgación de la información obtenida como resultado de investigaciones llevadas a cabo por el Departamento. Cabe resaltar que el citado Reglamento aplica a “toda solicitud, requerimiento, petición, citación, subpoena u orden de cualquier persona que implique la potencial divulgación de información recopilada para fines investigativos por el Departamento de Justicia”. Art. 5 del Reglamento Núm. 7450. Es mediante el Art. 7 del Reglamento que se desglosan las normas que rigen la divulgación de la información recopilada para fines de investigación y se dispone de manera detallada las garantías para mantener la confidencialidad. Este artículo reconoce que el derecho de acceso y a recopilar información de interés público no es irrestricto, toda vez que el Estado puede reclamar la confidencialidad de la información recopilada amparándose en varios supuestos, a saber: (1) cuando la Constitución lo requiere o una ley lo declara; (2) cuando la comunicación está protegida por privilegios evidenciarios; (3) cuando revelar la información puede lesionar derechos fundamentales de terceros; (4) *391 cuando se trate de la identidad de un confidente, y (5) cuando se trate de información oficial. Véase Art. 7 del Reglamento Núm. 7450.
De igual forma, el Art. 7 obliga a que en el momento de determinar si se debe divulgar alguna información que se encuentre en custodia del Departamento, se tomen en consideración todas las fuentes de derecho sustantivo pertinentes que crean privilegios, deberes de confidencialidad u otras limitaciones al derecho de acceso a la información de interés público. Debemos resaltar, además, que el artículo aludido reproduce íntegramente lo dispuesto en el Art. 13 de la Ley Núm. 205, a saber: que la información obtenida mientras se conduce la investigación del Departamento deberá mantenerse confidencial y no será susceptible de inspección, examen ni divulgación.(5)
Por otro lado, la Carta de Derechos de las Víctimas y Testigos de Delito también cuenta con disposiciones dirigidas a proteger la confidencialidad de la información entregada o comunicada por éstos. De hecho, de la mencionada Carta surge que las víctimas y los testigos tienen derecho a “[e]xigir que se mantenga la confidencialidad de la información sobre su dirección y números telefónicos cuando así lo estime necesario para su seguridad personal y de sus familiares”. Art. 2(c) de la Ley Núm. 22 de 22 de abril de 1988, según enmendada, 25 LPRA sec. 973a(c).
No cabe duda de que lo dispuesto en la Ley Núm. 205, el Reglamento Núm. 7450 y en la Carta de Derechos, en cuanto a la confidencialidad de la información recopilada, constituye una diáfana garantía que el Departamento viene llamado a cumplir y a ejecutar.(6)
*392 V
Como expusimos, los amplios poderes investigativos que se le han conferido a las agencias administrativas, incluido el Departamento, tienen límites pues de otra forma quebrantarían las protecciones constitucionales y los derechos que amparan a los individuos. Así, es norma reiterada que en nuestro ordenamiento jurídico se excluye evidencia pertinente, en aras de proteger importantes consideraciones de política pública y adelantar valores o intereses sociales ajenos a la búsqueda de la verdad. Pagán et al. v. First Hospital, 189 DPR 509 (2013), citando a E.L. Chiesa, Tratado de derecho probatorio, San Juan, Pub. JTS, 2009, T. I, págs. 185-186. Como es sabido, los privilegios evidenciarios constituyen una de esas instancias probatorias, a la vez que imponen límites al poder de investigación de las agencias administrativas. Ello, pues, debido a su naturaleza y función, los privilegios evidenciarios impiden el descubrimiento de ciertos actos, hechos o comunicaciones por existir intereses en conflicto que intervienen con esa búsqueda exhaustiva de la verdad. Pagán et al. v. First Hospital, supra, pág. 517; Pueblo v. Fernández Rodríguez, 183 DPR 770, 784 (2011); Pueblo v. De Jesús Delgado, 155 DPR 930, 939 (2001).
Ante la realidad de que los privilegios inciden con el propósito cardinal de las Reglas de Evidencia, que es la búsqueda de la verdad, la Regla 518 exige que estos se interpreten restrictivamente. 32 LPRAAp. VI. De ese mandato de interpretación restrictiva, se excluyen privilegios que gozan de rango constitucional. Se intima que el propósito de esta regla evidenciaría es evitar la ampliación indebida de los privilegios con el fin de no entorpecer la consecución de los procesos judiciales. Rodríguez v. Scotiabank de PR, 113 DPR 210, 214 (1982). Así, la disposición expresa de la Regla 518 exige que los foros judiciales rechacen cualquier invocación de un privilegio evidenciario cuando sur *393 jan dudas en cuanto a la presencia de los requisitos estatutarios exigidos para su existencia. Esto es, en caso de duda, los foros judiciales deben permitir la evidencia.
Recientemente en Pagán et al. v. First Hospital, supra, tuvimos la oportunidad de pronunciarnos con respecto a los privilegios evidenciarios. Resolvimos que estos no son automáticos, por lo que el peso de demostrar que se es acreedor de alguno de ellos reside en quien lo invoca, no en la parte contraria. Véase McCormick on Evidence, 6ta ed., St. Paul, Ed. Thompson-West, 2006, Vol. 1, Sec. 73.1, pág. 342. La parte que invoca el privilegio tiene el deber de sostenerlo, de forma fundamentada, cuando se intente divulgar la comunicación. Es decir, tiene el peso de demostrarle al juzgador, prontamente, las razones que convierten la comunicación en privilegiada. Pagán et al. v. First Hospital, supra, pág. 9. En ese proceso, debe establecer la existencia de los requisitos del privilegio que invoca mediante preponderancia de prueba.(7) íd., citando a McCormick on Evidence, op. cit., Sec. 6.3.1, pág. 591 esc. 3.
VI
Establecida la función cardinal que emana de los privilegios evidenciarios y discutida la manera como éstos deben interpretarse, es menester examinar el privilegio instituido en la Regla 511, el cual protege el vínculo entre la persona religiosa y persona creyente. 32 LPRA Ap. VI. Veamos.
El llamado privilegio religioso-creyente surge como parte del derecho constitucional a la libertad de culto y su objetivo primordial es proteger la confianza que una persona creyente deposita en la persona religiosa.
El profesor Chiesa Aponte destaca la importancia del privilegio, pues de lo contrario se menoscabaría el sacramento *394 de la confesión y otro tipo de comunicaciones confidenciales entre el creyente y el religioso. E.L. Chiesa, Reglas de Evidencia de Puerto Rico de 2009: análisis por el Prof. Ernesto L. Chiesa, San Juan, Pubs. JTS, 2009, pág. 168. Por lo tanto, para el referido profesor este privilegio está fundado, en gran parte, en el derecho a la intimidad. Id.
Como mencionamos, en nuestra jurisdicción este privilegio se encuentra estatuido en la Regla 511 de Evidencia de 2009. Conviene recordar que esta regla corresponde a la derogada Regla 28 de Evidencia de 1979, pero su sucesora contiene cambios sustanciales en su redacción para abarcar la multiplicidad de denominaciones religiosas que no utilizan los términos que establecía la derogada regla. Resaltamos que la nueva redacción de la Regla 511 no restringe la definición de la persona religiosa a ningún individuo o religión en particular. Más bien, se concibe su aplicación en términos abarcadores, pues se incluye a una variedad de denominaciones, a saber: sacerdote, pastora, pastor, ministra, ministro, rabino, practicante de una religión, funcionario o funcionaría similar de una iglesia, secta o denominación religiosa o de cualquier organización religiosa. 32 LPRAAp. VI, R. 511(a)(1).
En cuanto a la diversidad de denominaciones, el profesor Emmanuelli Jiménez señala que obedece a la necesidad de atender un sinnúmero de religiones o sectas que no necesariamente utilizan los términos creyente y religioso, de manera que se incluye a otras denominaciones de fe que no se refieren a estos conceptos. R. Emmanuelli Jiménez, Prontuario de derecho probatorio puertorriqueño: nuevas Reglas de Evidencia 2010, 3ra ed., San Juan, Ed. Situm, 2010, pág. 310. Por su parte, el profesor Chiesa Aponte subraya que la ampliación del concepto religioso se hace por imperativo constitucional. E.L. Chiesa, Reglas de Evidencia de Puerto Rico de 2009: análisis por el Prof. Ernesto L. Chiesa, San Juan, Pubs. JTS, 2009, pág. 168.
*395 Por otro lado, la persona creyente es definida en la regla como aquella que le hace una comunicación penitencial o confidencial a un religioso o religiosa. 32 LPRA Ap. VI, R. 511(a)(2). A su vez, la comunicación penitencial o confidencial es precisada en la regla como aquella que, en confidencia, emite una persona creyente, sin la presencia de una tercera persona, a una que es religiosa y quien en el curso de la disciplina o la práctica de su iglesia, secta, denominación u organización religiosa, está autorizada o acostumbrada a oír tales comunicaciones y que bajo tal disciplina tiene el deber de mantenerlas en secreto. 32 LPRAAp. VI, R. 511(a)(3).
En lo referente a quién puede invocar el referido privilegio, la Regla 511 dispone que tanto la persona religiosa como la creyente son poseedoras del privilegio. Es decir, ambas pueden rehusar revelar una comunicación penitencial o confidencial o impedir que otra persona la divulgue. 32 LPRA Ap. VI, R. 511(b). El motivo por el cual se extiende el privilegio a la persona religiosa es porque la ley no puede compeler a que en determinadas circunstancias ésta transgreda, ni castigarlo por rehusarse a quebrantar, las normas de su organización religiosa que le obligan a mantener ciertas comunicaciones en secreto. Véase Secretariado de la Conferencia Judicial y Notarial, Informe de las Reglas de Derecho Probatorio, San Juan, [sin Ed.], 2007, págs. 280-281.
Al examinar la Regla 511, nos percatamos de que la misma eleva a rango estatutario la protección de las comunicaciones habidas entre una persona religiosa y otra creyente. Basta con una mera lectura del texto de la regla para percatarse de que no cabe hablar de protección cuando en la comunicación entre las partes mencionadas intervienen o están presentes terceras personas.
A. A pesar del análisis restrictivo que exige la Regla 518 a la hora de examinar la mayoría de los privilegios evidenciarios, debemos reconocer que el legislador ha ampliado *396 el alcance del privilegio dispuesto en la Regla 511. Como discutimos, la inclinación ha sido extender la protección del privilegio para que ampare a toda denominación religiosa y, más que todo, no restringirlo al sacramento de la confesión. No se puede pretender que la comunicación protegida se circunscriba estrictamente al sacramento de la confesión de la religión católica. Sabido es que este tipo de práctica religiosa no se concibe en otras denominaciones. En consecuencia, revestir de protección solo a este sacramento menoscabaría el derecho a la igual protección de las leyes, constituiría una intromisión impermisible con la libertad de culto, a la vez que amenazaría otras salvaguardas constitucionales. Véase E.J. Imwinkelried, New Wigmore: A Treatise on Evidence—Evidenciary Privileges, 2da ed., Nueva York, Ed. Aspen Publishers, 2010, Sec. 6.9.1. Sin duda, delimitar el privilegio a las prácticas de la religión católica constituiría un proceder patentemente inconstitucional. Sobre el particular, el Secretariado de la Conferencia Judicial y Notarial, al presentar sus recomendaciones sobre las Reglas de Evidencia, señaló que:
La comunicación privilegiada no puede circunscribirse a la confesión estrictamente por interferir con los derechos de igual protección de las leyes y libertad religiosa. Sin embargo, no puede ser tan amplia que extienda el privilegio a todo tipo de comunicación con el funcionario religioso. (Enfasis suplido). Secretariado de la Conferencia Judicial y Notarial, supra, pág. 281.
Cónsono con lo anterior, los recientes desarrollos y formulaciones en materia de derecho probatorio tienden a no ceñir el privilegio religioso-creyente a las comunicaciones ligadas al sacramento de la confesión. Más bien, lo han ampliado a otro tipo de situaciones en donde la persona creyente de cualquier denominación religiosa busca en la persona religiosa consejería o guía espiritual (consejería espiritual). De hecho, en el tratado de The New Wigmore se reseña ampliamente que:
*397 The clergy-penitent privilege was originally restricted to sacramental, doctrinally required confessions, and there is still support for that view. This view strictly confines the privilege to confessional communications required by the tenets of a religion. However, the tendency has been to broaden the privilege to apply to non-penitential communications in which the layperson confers with the clergy in clergyperson’s capacity as a spiritual advisor Under this broader standard, the privilege applies not only when the layperson seeks forgiveness for a past sin but also when the layperson seeks guidance as to a future ethical choice.
Moreover, the liberal tendency would be consistent with a shift toward a humanistic theory. As previously stated, under that theory the point of a privilege is to create a private enclave to enable persons to seek expert advice enabling them to make more intelligent, independent life preference choices. Under that theory it makes eminently good sense to expand the privilege to apply whenever a fideist seeks spiritual advice from a religious counselor. Indeed, it would be ironic if the privilege protected members of the faith who had violated tenets of the faith and had to confess such violations but not fideits who had observed the tenets and sought spiritual counseling to deepen their faith. (Énfasis suplido y citas omitidas). Imwinkelried, op. cit, Sec. 6.11.1.
De acuerdo con estos desarrollos jurídicos, además del sacramento de la confesión, la comunicación estatuida en la Regla 511 incluye también la consejería espiritual, brindada por una “persona religiosa”, desempeñándose en tal capacidad. Esta práctica adquiere carácter privilegiado bajo el palio de la regla evidenciaría en cuestión. Dictaminar lo contrario sería dar al traste con las tendencias ex-pansivas e inclusivas del privilegio. Además, otro aspecto que requiere examinarse, en aras de resolver si aplica el privilegio, es si la persona religiosa en cuestión está autorizada a proporcionar la llamada consejería espiritual y, para fines de la comunicación, actúa en ese rol de consejera. Id., sec. 6.9.1. Véase, además, In re Grand Jury Investigation, 918 F.2d 374 (3er Cir. 1990).
Ahora bien, aunque reconocemos que la protección incluye la llamada consejería espiritual, concluimos que la *398 protección no puede ser tan amplia que extienda el privilegio a todo tipo de comunicación con la persona religiosa. Empero, la determinación de lo que constituye comunicación privilegiada o una comunicación no protegida tendrá que realizarse analizando las circunstancias particulares de cada caso, a la luz de la normativa expuesta. Véase Imwinkelried, op. cit., Sec. 6.11.1.
VII
Más allá de los límites que los privilegios evidenciarios le imponen al poder de investigación de las agencias, la controversia ante nos requiere que no perdamos de perspectiva la garantía constitucional de expectativa de intimidad que ampara a los individuos. Como sabemos, nuestro andamiaje constitucional consagra el principio cardinal de la inviolabilidad de la dignidad del ser humano, a la vez que reconoce como derechos fundamentales la intimidad y la protección contra ataques abusivos a la honra, la reputación y la vida privada o familiar. Véase Secs. 1 y 8, Art. II, Const. ELA, LPRA, Tomo 1. A estos derechos fundamentales, le hemos reconocido particular preeminencia en nuestro esquema constitucional. Por lo tanto, nuestros pronunciamientos jurisprudenciales dejan meridianamente claro que el Estado tiene una función dual para proteger lo contenido en nuestra ley suprema, esto es: (1) abstenerse de actuar de forma tal que se infrinja el ámbito de autonomía e intimidad individual, y (2) actuar afirmativamente en beneficio de los ciudadanos. Soc. de Gananciales v. Royal Bank de PR, 145 DPR 178, 201 (1998).
En lo referente al derecho fundamental a la intimidad, reiteradamente hemos expresado que este derecho goza de la más alta protección bajo el palio de nuestra Constitución. Por su carácter privilegiado, el derecho a la intimidad opera ex propio vigore e incluso puede invocarse frente a personas particulares, sin la necesidad de que concurra el requisito *399 de acción estatal. López Tristani v. Maldonado, 168 DPR 838, 850 (2006); López v. E.L.A., 165 DPR 280, 295 (2005); Arroyo v. Rattan Specialties, Inc., 117 DPR 35, 64 (1986). Nuestros pronunciamientos jurisprudenciales sobre el particular revelan que este derecho se lesiona cuando se limita la facultad del individuo para tomar decisiones personales, familiares o de carácter íntimo. Soc. de Gananciales v. Royal Bank de PR, supra, pág. 202.
El criterio de umbral para reconocer si se ha infringido el derecho a la intimidad es si la persona afectada alberga una expectativa de intimidad y si tal expectativa es razonable a la luz de los criterios prevalecientes en la sociedad.(8) Weber Carrillo v. ELA et al., supra. Debemos acentuar que el mencionado derecho constitucional constituye un ámbito capaz de impedir o limitar la intervención de terceros, ya sean particulares o poderes públicos, contra la voluntad del titular. López Tristani v. Maldonado, supra, pág. 849. Por lo tanto, hemos afirmado que en nuestra jurisdicción se le impone a toda persona, incluido el Estado, el deber de no inmiscuirse en la vida privada o familiar de *400 los demás. Colón v. Romero Barceló, 112 DPR 573, 576 (1982). Además, recientemente resolvimos:
La intromisión del Estado en la vida privada de un individuo, cuando es necesaria para llevar a cabo una investigación criminal, no está prohibida pero sí limitada, pues el interés gubernamental de poner en vigor las leyes penales y combatir el crimen no permite violar los derechos de los ciudadanos y las ciudadanas a su intimidad. (Enfasis suplido). Weber Carrillo v. ELA et al., supra, pág. 698.
Ahora bien, un reclamo de violación al derecho a la intimidad no puede coartar de plano la facultad del Estado de investigar y procesar a los infractores de las leyes penales. La autoridad para determinar si se procesa o no a los infractores de nuestro precepto penal es exclusiva del Estado, por lo que las víctimas no tienen el poder de vetar el curso de acción estatal. Pueblo v. Castellón, supra, pág. 25. Resolver que las víctimas tienen la facultad para decidir si se procesa o no a un perpetrador de conducta delictiva, al amparo de un derecho constitucional o de otro reclamo, atentaría con el interés legítimo y apremiante del Estado de investigar y procesar a los que quebrantan las normas penales.
En lo concerniente al asunto ante nos, aunque no dudamos que el derecho a la intimidad protege a las víctimas de abuso sexual en ciertas circunstancias, reconocemos que ese derecho no es absoluto. Ello, toda vez que este se enfrenta al interés del Estado de investigar y procesar a los que incurren en conducta criminal.
Sabido es que en nuestro ordenamiento jurídico existen modalidades de delitos en los cuales no importa ni es pertinente la edad o capacidad mental de la víctima, sino el abuso de la relación de autoridad para tener acceso a ésta. Véanse: 33 LPRA see. 5191; D. Nevares-Muñiz, Código Penal de Puerto Rico: comentado, Instituto para el Desarrollo del Derecho, 2012, pág. 195.
A tales efectos, el examen en cuanto a la aplicación del derecho a la intimidad no puede circunscribirse a un mero *401 análisis de si se es mayor de edad o no. Por lo tanto, el solo hecho de ser mayor de edad no implica que pueda invocarse válidamente un derecho de intimidad, y de esa forma obstaculizar otros intereses que muy bien pudiesen ser legítimos y apremiantes. Mucho menos, podemos disponer de un reclamo de intimidad a base de especulaciones o imaginaciones, sustituyendo el mecanismo objetivo de la inspección en cámara de la totalidad de los documentos por estos criterios subjetivos. Nos preguntamos, entonces: ¿Qué garantías tenemos de que las alegadas víctimas de delitos sexuales en este caso no se encuentran amenazadas para no declarar? ¿Acaso concluir que existe un derecho a la intimidad en esta etapa, sin aún contar con el beneficio de un cuadro más amplio, no tiene el efecto colateral de inmunizar posibles conductas punibles? Ante ese cuadro e interrogantes de umbral, me parece prematuro adjudicar en el vacío un reclamo de intimidad en esta etapa de los procedimientos, tal como lo ha hecho una Mayoría de este Tribunal al concederle un poder de veto al adulto interventor y otras posibles víctimas.
VIII
En esta coyuntura, vale preguntarse entonces, qué herramientas tienen los foros judiciales ante un reclamo de que los documentos o la información solicitada por una agencia pueden ser de naturaleza privilegiada o si existe una expectativa de intimidad sobre éstos. En relación con ello, avalamos el razonamiento de que la confidencialidad de la información se determine a base de un análisis de la totalidad de las circunstancias que rodean la comunicación, así como su propia naturaleza. Adviértase que en este quehacer, el mecanismo altamente favorecido, apropiado y útil es el examen en cámara. Colón Cabrera v. Caribbean Petroleum, 170 DPR 582 (2007); E.L.A. v. Casta, 162 DPR 1 (2004); Pres. del Senado, 148 DPR 737 (1999); Santiago *402 v. Bobb y El Mundo, Inc., 117 DPR 153 (1986); Soto v. Srio. de Justicia, 112 DPR 477 (1982). Este mecanismo forma parte primordial en el ordenamiento jurídico federal y no es la excepción en nuestra jurisdicción.
En esencia, el examen en cámara permite al juzgador dirimir los reclamos de confidencialidad en cuanto a documentos o información que estén en controversia. Particularmente, hemos expresado que cuando una parte alega que la información es privilegiada, el examen en cámara constituye, de ordinario, una condición previa al reconocimiento del privilegio. E.L.A. v. Casta, supra; Santiago v. Bobb y El Mundo, Inc., supra; Peña Clos v. Cartagena Ortiz, 114 DPR 576 (1983).
Este examen le brinda la oportunidad al juzgador de analizar cada uno de los documentos en cuestión y, de esa forma, ejercer su tarea constitucional de determinar cuáles gozan de protección, por lo que deben ser catalogados como confidenciales, o cuáles no están cobijados por algún privilegio o derecho. Por lo tanto, refrendamos la visión judicial que avala que los foros judiciales realicen, de ordinario, un examen en cámara de los documentos reclamados como privilegiados, antes de hacer una determinación a tales efectos.
IX
La polémica suscitada y traída ante la consideración de esta Curia amerita que nos pronunciemos con respecto a la manera en que el Estado se interrelaciona con las prácticas religiosas y la forma en que los tribunales deben examinar este vínculo. Es una realidad irrefutable que la zona de acción del Estado suele entremezclarse, de una forma u otra, con la religión. Ante este escenario, los tribunales estamos llamados a intervenir para alcanzar un balance armonioso entre la obligación estatal de salvaguardar los intereses de *403 los ciudadanos y su deber de no quebrantar las garantías constitucionales vinculadas con asuntos religiosos.
Es norma firmemente establecida que al amparo de la Constitución, tanto de Estados Unidos como de Puerto Rico, se garantiza la práctica de las creencias religiosas individuales o colectivas. De esta forma, hemos sido concluyentes en afirmar que la libertad de culto es absoluta y no proceden intromisiones indebidas contra ésta. No obstante, señalamos que la autonomía para actuar conforme a las creencias religiosas podría tener sus limitaciones.
Respecto a lo anterior, esta Curia ha reconocido que aquellas actuaciones estatales que no afecten adversamente la religión o lo hacen de modo incidental y, a su vez, persiguen un interés apremiante, de ordinario, prevalecerán sobre los reclamos incoados al amparo del Art. II, Sec. 3, de nuestra Constitución.(9) Es decir, cuando exista un interés legítimo y apremiante y la intervención estatal con la práctica religiosa sea incidental, la acción gubernamental, de ordinario, será constitucionalmente permisible. Asoc. Academias y Col. Cristianos v. E.L.A., 135 DPR 150, 160 (1994). En cambio, si la intervención gubernamental es neutral, de aplicabilidad general, y está relacionada con asuntos seculares que recaen uniformemente en todo un género de actividades, el Estado no tendrá que justificar un interés apremiante, siempre y cuando el efecto sobre la práctica religiosa sea de tipo incidental. íd., págs. 160-161. En armonía con lo anterior, en Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 US 520, 531 (1993), el Tribunal Supremo federal concluyó lo siguiente:
[A] law that is neutral and of general applicability need not to *404 be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice [...] A law failing to satisfy these requirements must be justified by a compelling government interest and must narrowly tailored to advance that interest. (Énfasis suplido).
A la luz de lo expuesto, reiteramos que actos estatales pueden repercutir en la zona de la iglesia, pero ello no conlleva su invalidez automática. Es constitucionalmente válido que el Estado, en su función de velar porque se cum-plan las leyes y proteger la paz, la moral y el orden público, interfiera incidentalmente con la práctica de una religión. Asoc. Academias y Col. Cristianos v. E.L.A., supra, págs. 160-161. Empero, no es permisible que la acción estatal afecte indebida e innecesariamente el libre ejercicio de las creencias religiosas.
Hacemos hincapié en que si en la consecución de un fin apremiante el Estado afecta adversamente la práctica de una religión, las garantías constitucionales requieren que se hagan concesiones para permitir el libre ejercicio de las creencias religiosas. Id. En estas circunstancias, el Estado deberá probar: (1) la existencia de un interés legítimo y apremiante que justifique su acción, y (2) que esta no puede ser sustituida por medios menos onerosos.
Con respecto al peso de la prueba, esta Curia ha resuelto que la persona que cuestiona una intervención estatal, al amparo de la garantía de libertad de culto, viene llamada a establecer que el Estado no tiene el correspondiente interés público que justifique su actuación o que se ha impuesto un gravamen o carga sustancial al ejercicio de su religión. íd., pág. 161. Esto es, la parte que alegue que su libertad de culto ha sido infringida, tiene el peso de probar la forma en que la actuación gubernamental lo hace. Como mencionamos, es norma reiterada que una carga mínima o incidental impuesta por el Estado a una parte, de ordinario, no es suficiente para invocar exitosamente el derecho a la libertad de culto. Id.
*405 A. Al amparo de la normativa expuesta en el acápite que antecede, los foros judiciales han validado acciones gubernamentales que, de una forma u otra, repercuten en asuntos de alguna religión. En ese sentido, existen circunstancias en las que el interés apremiante y secular tiene suficiente peso y ha sido determinante para permitir la intervención estatal. En cuanto a ello, en el libro Religious Organizations and the Law se señala que:
The general rule is that the courts are prohibited by the First Amendment from getting involved in intra-church disputes when doing so would require them to become entangled in religious affairs. However, when a dispute can be analyzed and resolved by application of neutral principles of law, the court will often take jurisdiction. Thus, if a court determines that adjudication would require the court to choose between competing religious visions or cause interference with a church’s administrative prerogatives, the disputes is truly of a religious nature, rather than theoretically and tangentially touching on religion, and the claim is barred from secular court review; if, however, the dispute can be resolved by the application of purely neutral principles of law and without impermissible government intrusion, e.g., where the church offers no religious based justification for its actions and points to no internal governance rights that would actually be affected, there is no First Amendment shield to litigation, even when the dispute arises from activity that occurred in a religious setting. (Enfasis suplido y citas omitidas). 2 Bassett, Cole and Smith, Religious Organizations and the Law Sec. 10:44, págs. 145-146 (2012).
A tono con este proceder, tribunales han rechazado extender el privilegio del religioso-creyente para cobijar de inmunidad investigaciones internas de la iglesia. Esto, cuando las acciones del Estado cumplen a cabalidad con la normativa discutida. Basta con examinar dictámenes de tribunales federales para percatarse de que éstos no han extendido el privilegio de la comunicación penitencial a las comunicaciones emitidas en el contexto de una investigación eclesiástica de conducta impropia por parte de miembros del clero. Véanse: Roman Catholic Archbishop of Los Angeles v. Superior Court, 131 Cal. App. 4th 417 (2005); *406 People v. Campobello, 348 Ill. App. 3d 619 (2004); Society of Jesus of New England v. Commonwealth, 441 Mass. 662 (2004).
Sostenemos tal contención y razonamiento. Consideramos que no todas las comunicaciones emitidas en el contexto de una investigación eclesiástica, están automáticamente revestidas de protección al amparo del privilegio estatuido en la Regla 511. Del mismo modo, concluimos que la protección tampoco se extiende, de forma automática, a todos los documentos que se generan en el contexto de una investigación eclesiástica. De lo que hoy determinamos, ex-ceptuamos, claro está, las comunicaciones que se hacen durante el sacramento de la confesión y, tal como interpretamos, aquellas que se enmarcan en la llamada consejería espiritual, cuando son realizadas por una persona religiosa en su rol de consejero. Véase In re Grand Jury Investigation, supra.
Sin duda, no es nuestro rol inmunizar todo lo que acontece en un entorno religioso, máxime cuando se trata de un potencial abuso sexual contra seres humanos. Asimismo, la interpretación que realizamos permitirá que la Regla 511 de nuestro ordenamiento evidenciario esté en armonía con el mandato legislativo, el cual recogió los recientes desarrollos en materia de derecho probatorio.
X
Examinado el marco jurídico y estatutario correspondiente, y resueltas las cuestiones de umbral, pasamos a disponer de la controversia ante nos.
Tal y como reseñamos, este caso tuvo su origen cuando el Obispo y el Vicario General impugnaron sendos subpoenas emitidos por el Departamento. En síntesis, alegaron que estos infringían garantías constitucionales y quebrantaban el privilegio evidenciario estatuido en la Regla 511. Por su *407 parte, el ELA sostuvo que su actuación perseguía un interés apremiante, que no representaba una intromisión indebida con la religión y que tenía las salvaguardas necesarias para proteger la confidencialidad de la información requerida. Ante ello, el foro de instancia decretó la constitucionalidad de los subpoenas en cuestión, exceptuando lo obtenido en el sacramento de la confesión, y ordenó la entrega de la información solicitada por el Departamento.
No podemos avalar el dictamen emitido por el foro aludido. Entendemos que este incidió al ordenar, a ciegas, la entrega de todos los documentos en controversia. Asimismo, concluimos que actuó de forma improcedente al circunscribir el privilegio de la Regla 511, supra, al sacramento de la confesión.
Ante el reclamo de los demandantes y el Interventor de que los documentos requeridos estaban cobijados por privilegios y que tenían una expectativa de intimidad sobre estos, el tribunal de instancia debió celebrar una inspección en cámara. Como expusimos, ese es el mecanismo más apropiado y útil que tiene el juzgador para dirimir este tipo de reclamo, y es cónsono con el remedio que los demandantes han expuesto y solicitado. Erró el foro al descartar, sin más, realizar este procedimiento.
Por otra parte, el foro primario solo le otorgó la protección que emana de la Regla 511 a las comunicaciones emitidas durante el sacramento de la confesión. Somos de la opinión de que, con este proceder, el referido foro se alejó de todo el desarrollo jurídico vigente en materia de derecho probatorio. A su vez, revestir de protección solo al mencionado sacramento, constituye una intromisión indebida con los asuntos de otras denominaciones religiosas, a la vez que, como discutimos, atenta contra garantías constitucionales firmemente establecidas. En conformidad con lo interpretado en esta opinión, no podemos sostener ni impri *408 mirle un sello de corrección al razonamiento del tribunal de instancia.
Si bien reconocemos la amplia facultad del Departamento para investigar aquellos actos que podrían constituir violaciones a las leyes penales y que los subpoenas en cuestión podrían adelantar un interés estatal apremiante, ante la ausencia de una inspección en cámara previa, su concesión automática constituiría una acción excesiva del Estado. Esto, ya que en lo requerido por el Departamento podría haber comunicaciones emitidas tanto en el sacramento de la confesión como en consejería espiritual. De igual forma, sin la intervención de un juzgador por medio de un examen en cámara, y en vista de la etapa en que se encuentra el presente caso, no podemos concluir que el requerimiento estatal es contrario a un interés apremiante y que éste constituye una intervención indebida en relación a la manera en que la institución religiosa maneja sus asuntos internos. Ante la coyuntura particular, tampoco cabe afirmar que el Estado pretende pasar juicio valorativo sobre esos asuntos, ni mucho menos determinar que la información requerida no es necesaria para la investigación criminal.
Respetuosamente considero que la Mayoría de este Tribunal debió enmarcar el procedimiento ordenado en los parámetros objetivos de este disenso.
Precisamente, a la luz del derecho expuesto, ordenaría que el foro de instancia realice un examen en cámara, con el fin de determinar cuáles documentos y comunicaciones están protegidas y cuáles no. En consecuencia, devolvería el caso al foro primario para que, en un término perentorio, ejecute la correspondiente inspección de todos los documentos.
En armonía con lo que hemos ordenado ante situaciones análogas, para la realización del examen en cámara hubiese establecido el siguiente procedimiento, a saber: (1) los demandantes someterán al tribunal una relación, bajo jura *409 mentó, de todos los documentos en su poder, concernientes a lo requerido por el Departamento; (2) en la referida relación se deben identificar adecuadamente todos los documentos en cuestión y se tomarán previsiones para proteger la identidad de las posibles víctimas de delito; (3) no será necesario que se incluya una descripción del contenido de los documentos; (4) debe especificarse cuál o cuáles de los documentos no deben ser revelados, expresando todas las razones y fundamentos para ello, y (5) el tribunal de instancia ordenará que los demandantes produzcan los documentos para ser inspeccionados, con exclusión de las partes y sus abogados. En todo caso, el foro de instancia tendrá discreción para regular y dirigir estos procedimientos, siempre y cuando su proceder sea compatible con lo aquí resuelto.
Realizado el correspondiente examen, el foro judicial ordenará la entrega de copia de aquellos documentos que determine que no están protegidos, en conformidad con lo interpretado en esta Opinión. Del mismo modo, denegará el acceso a los demás documentos que concluya están protegidos.
Sostenemos que una vez inspeccionados los documentos mediante el referido procedimiento, el Tribunal de Primera Instancia estará en posición de adjudicar el reclamo de violación al derecho de intimidad instado por el Interventor. La razón de ello es que desconocemos el grado de expectativa, la posible divulgación a otras personas y el contexto en que se emitieron las comunicaciones del Interventor. Sin la debida inspección de los documentos, lo que tenemos ante nos son meras alegaciones. Además, no podemos obviar que una Mayoría de este Tribunal le ha otorgado al Interventor un poder de veto.
En fin, como hemos expresado, el Estado tiene un rol constitucional de garantizar el orden público y procesar a los infractores de las leyes penales. Sin embargo, no puede llevar a cabo tal trascendental función en detrimento de los derechos de los ciudadanos. En vista de ello, es función *410 inherente de los tribunales intervenir para lograr la armonía necesaria que debe existir entre las prerrogativas del Estado y los derechos que cobijan a los ciudadanos. Habida cuenta de que este balance se ve tronchado por el curso de acción delineado por una Mayoría de este Tribunal, DISIENTO.

 Para una discusión sobre el particular, véase H.A. Meléndez Juarbe, La Constitución en ceros y unos: un acercamiento digital al derecho a la intimidad y la seguridad pública, TI Rev. Jur. UPR 45 (2008).

 En síntesis, los subpoenas requerían que tanto el Obispo como el Vicario General comparecieran ante la Fiscalía de Arecibo para prestar testimonio y suministrar nombres, direcciones y toda información relacionada a los querellantes menores de edad y adultos que han alegado ser víctimas de delitos sexuales, en los últimos diez años, por parte de sacerdotes católicos adscritos al área que comprende la región de Arecibo y pueblos limítrofes. Del mismo modo, los subpoenas solicitaban a los referidos funcionarios eclesiásticos que informaran la forma cómo la institución religiosa y las personas atendieron estos asuntos y los resolvieron.

 En relación con las investigaciones, el Tribunal de Primera Instancia determinó que con posterioridad al momento en que las víctimas emitieron sus respectivas denuncias o declaraciones, en el proceso investigativo intervinieron otros clérigos o sacerdotes. De la resolución emitida por el foro de instancia no se desprende que los que intervinieron eran personas ajenas a la institución religiosa. Véase Apéndice de la Petición de certificación intrajurisdiccional, págs. 63 y 104. Hacemos hincapié en que de los documentos que obran en autos tampoco surge si en las aludidas investigaciones participaron notarios, consultores, y otros profesionales. Más bien, lo que hace el foro primario es describir, a grandes rasgos, lo establecido en el Procedimiento de la Conferencia Episcopal, sin pormenorizarlo a los hechos de este caso. Véase Apéndice de la Petición de certificación intrajurisdiccional, pág. 59.

 Reglamento para establecer las normas de divulgación de información obtenida como resultado de investigaciones realizadas por el Departamento de Justicia, Reglamento Núm. 7450 de 4 de enero de 2008.

 En casos en los que, por excepción, se permita la divulgación de información, el Secretario retiene discreción y autoridad para determinar las condiciones en que se hará. Véase Art. 7 del Reglamento Núm. 7450.

 Es mi criterio que las víctimas de delito, independientemente de su edad, gozan de protecciones adicionales que emanan de la Constitución, como veremos en el restante análisis de esta Opinión.

 Este Tribunal ha precisado que preponderancia de la prueba equivale a que se establezcan “como hechos probados aquéllos que con mayores probabilidades ocurrieron”. Zambrana v. Hospital Santo Asilo de Damas, 109 DPR 517, 521 (1980).

 Aunque esta Curia adoptó ese método del Tribunal Supremo de Estados Unidos y lo ha reiterado hasta el presente, es preciso señalar que la aplicación del segundo criterio expuesto, es decir, la llamada “expectativa objetiva”, ha sido objeto de diversos debates. A modo de ejemplo, el profesor Ramos González resalta ampliamente las dificultades de aplicar el requisito de la “expectativa objetiva”, pues concluye que ésta provoca que sean otros, no presentes en el tribunal como reclamantes, quienes en última instancia determinen la valorización del reclamo de intimidad y dignidad instado por un ciudadano. De esta forma, el referido profesor sostiene que:
“[E]n la medida que el derecho de intimidad es complementario o consustancial a la dignidad humana, en esa misma extensión la metodología sobre “búsqueda de expectativas razonables de intimidad” es insuficiente para valorar una violación al derecho de intimidad de la Sección 8 del Artículo II de la Carta de Derechos. En la etapa de la evaluación inicial de lo alegado, la metodología no puede aumentar el peso de la prueba del demandante y disminuir la del demandado dado la dimensión que tiene el derecho de intimidad sobre la dignidad humana. Si así se hace, se corre el riesgo de entender el derecho de intimidad puertorriqueño como uno que garantiza u honra meras expectativas cuando más bien debe interpretarse que este derecho garantiza la intimidad y obliga a promover su desarrollo. Es decir, la metodología de “expectativas razonables” evita que aflore la función dual de nuestra Carta de Derechos y nuestra vocación inconclusa de estado social y democrático: vindicar la dignidad humana y, como parte de este norte, limitar los poderes del gobierno e imponerle obligaciones a ese estado”. C.E. Ramos González, La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el derecho constitucional puertorriqueño, 45 Rev. Jur. UIPR 185, 201 (2010-2011).

 En cuanto a lo que puede constituir un interés apremiante, esta Curia ha expresado que:
“[D]ifícilmente existe un interés estatal más apremiante que el de proteger la seguridad de los ciudadanos de este País mediante el procesamiento, correcto y adecuado, de las personas acusadas de cometer delitos en detrimento de la tranquilidad y sosiego de nuestra sociedad”. (Énfasis suplido). Rodríguez Del Valle v. Corcelles Ortiz, 135 DPR 834, 845 (1994).